[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re M.H.*, Slip Opinion No. 2020-Ohio-5485.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2020-OHIO-5485

IN RE M.H.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re M.H.*, Slip Opinion No. 2020-Ohio-5485.]

*Fifth Amendment—Due process—Suspect's questioning by child-abuse investigator did not violate* Miranda v. Arizona *or suspect's federal due-process rights, because investigator was neither a law-enforcement officer nor acting under direction or control of police and confession obtained was not causally related to any conduct of police—Court of appeals' reversal of trial court's suppression of statement to investigator affirmed.*

(No. 2019-0621—Submitted April 29, 2020—Decided December 3, 2020.)

APPEAL from the Court of Appeals for Cuyahoga County,

No. 105742, 2018-Ohio-4848.

_____

KENNEDY, J.

{¶ 1} In this discretionary appeal from the Eighth District Court of Appeals, we are asked whether a child-abuse investigator employed by a county children-

services agency must give the warnings required by the Supreme Court of the United States in *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), before questioning a child suspected of committing child abuse. We are also asked whether the admission at trial of an incriminating statement obtained from a child suspect by a county child-abuse investigator violates the due-process protections of the Fourteenth Amendment.

{¶ 2} Binding precedent answers both questions. We held in *State v. Jackson* that a child-abuse investigator employed by a county children-services agency is not required to provide the *Miranda* warnings before questioning a suspect in a child-abuse investigation when the investigator is neither a law-enforcement officer nor an agent of law enforcement acting under the direction or control of the police. 154 Ohio St.3d 542, 2018-Ohio-2169, 116 N.E.3d 1240, ¶ 15, 30. And in *Colorado v. Connelly*, the Supreme Court of the United States explained that "[a]bsent *police conduct* causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." (Emphasis added.) 479 U.S. 157, 164, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

{¶ 3} The evidence demonstrates that at the time the child-abuse investigator interviewed the suspect in this case, the investigator was neither a law-enforcement officer nor acting under the direction or control of the police. Further, the confession obtained was not causally related to any conduct of the police. The questioning in this case therefore violated neither *Miranda* nor the suspect's federal due-process rights, and the court of appeals correctly concluded that the confession resulting from it was admissible at trial.

{¶ 4} Accordingly, we affirm the judgment of the Eighth District Court of Appeals.

2

**Facts and Procedural History**

{¶ 5} The Cuyahoga County Department of Children and Family Services ("CCDCFS") received a referral reporting that 13-year-old M.H. had engaged in sexual activity with J.M., the 12-year-old daughter of M.H.'s mother's boyfriend. Esther Bradley, a child-protection specialist in CCDCFS's Sex Abuse Intake Unit, interviewed J.M. and told her mother to submit a police report.

{¶ 6} Bradley opened a sex-abuse investigation and left at M.H.'s residence for M.H.'s mother a letter specifying a time and place for Bradley to interview M.H. According to M.H.'s mother, neither the letter nor Bradley in a subsequent telephone call informed her that M.H. was a suspect in an investigation, but M.H.'s mother was aware of allegations that M.H. had touched J.M. while she was asleep. M.H.'s mother did not know that she could decline the interview, and she brought M.H. to CCDCFS to be questioned. Bradley had told M.H.'s mother that it would be a private interview and that she would not be permitted to accompany M.H. Bradley took M.H. to a room and closed the door, leaving his mother in the waiting room. Bradley did not advise M.H. of his *Miranda* rights prior to the interview, and M.H. admitted during the interview that he had engaged in sexual activity with J.M. Bradley prepared a report for the police.

{¶ 7} The Cleveland police department assigned the case to Detective Christina Cottom, and on August 24, 2016, she filed a juvenile-delinquency complaint alleging that M.H. committed two counts of rape and two counts of gross sexual imposition. The state moved in limine to admit M.H.'s incriminating statement, and M.H. moved to suppress it, asserting that his statement was involuntary, that he had not been advised of or validly waived his *Miranda* rights, and that his statement's probative value did not outweigh its prejudice to his defense.

{¶ 8} At the suppression hearing, Bradley testified that she had a dual purpose in interviewing M.H. The first was to determine whether any type of

inappropriate sexual activity had occurred between M.H. and J.M., "and if anything criminal happened, then [Bradley would] pass that on to law enforcement." The second purpose was to ensure J.M.'s safety and make sure that nothing inappropriate occurred while the investigation was ongoing. Bradley admitted that CCDFCS has a relationship with law enforcement, that she regularly shares information with the police, and that she knew that a detective had been assigned to the case. She also admitted that she had previously been employed as a police detective in Atlanta, Georgia, and was aware of the *Miranda* warnings. But she explained that in her work for CCDFCS, she was "not law enforcement" and did not have arrest powers; rather, her role was to make sure that families and children receive the services they need. Bradley could not remember whether she had been contacted by the police before she interviewed M.H., but she "[did not] think so."

{¶ 9} Detective Cottom testified that she normally coordinates with CCDFCS to interview the alleged victim jointly but that in this case, Bradley had interviewed both J.M. and M.H. before Detective Cottom was able to contact her. For this reason, the detective never interviewed M.H., and she testified that she did not direct Bradley to interview M.H. on behalf of the police or tell Bradley what questions to ask him. Detective Cottom explained that she did not even know that the interview had occurred until after she received Bradley's report approximately two months later.

{¶ 10} The trial court granted the motion to suppress, finding that "the relationship between [CCDCFS and] the State [is] a little close for comfort." The court concluded that M.H.'s statement had been obtained in violation of his due-process rights and that it was inadmissible under Evid.R. 403(A). It also denied the state's motion in limine.

{¶ 11} The Eighth District Court of Appeals reversed and remanded. The lead opinion recognized that a social worker may have a duty to give a suspect the *Miranda* warnings when the social worker acts under the direction or control of law

4

enforcement. 2018-Ohio-4848, ¶ 22. But here, the lead opinion concluded, "there is no evidence that [Bradley] was acting under the direction or control of law enforcement when she interviewed M.H., despite her cooperation with law enforcement." *Id*. at ¶ 35. It also concluded that M.H. was not in custody during the interview and that Bradley had not compelled him to incriminate himself in violation of his due-process rights. *Id.* at ¶ 35, 39-40. The lead opinion noted that M.H. was not under arrest, his mother had brought him to the interview, he had not been ordered to appear at a police station, he was not restrained, the door to the interview room was closed but not locked, the interview lasted approximately 40 minutes, and he was free to leave the building after the interview. It also explained that "[t]here is no evidence—or allegations—of any threats, coercion, suggestions, restraints, or physical deprivation or harm to M.H." *Id*. at ¶ 40. Lastly, the lead opinion determined that Evid.R. 403(A) would not preclude admission of M.H.'s statement because the record did not demonstrate that admitting the statement would be unfairly prejudicial. *Id*. at ¶ 41-42.

{¶ 12} We accepted M.H.'s discretionary appeal on the following three propositions of law:

> (1) The statement of a child to a government social worker may be involuntary and violate due process even when the government social worker was not required to give Miranda warnings.
>
> (2) A child does not feel free to leave when a [sic] he is driven to [a] government agency for questioning by a parent and separated from that parent and interrogated in a private interrogation room without being told he is free to leave and free to not cooperate.
>
> (3) A child-suspect must be provided *Miranda* warnings when that child is interrogated by a social worker who is exercising

her statutory duty to investigate child abuse allegations and does so
cooperatively with the police on a regular and institutional basis.

*See* 156 Ohio St.3d 1452, 2019-Ohio-2780, 125 N.E.3d 947.

**Positions of the Parties**

{¶ 13} M.H. maintains that in determining whether a child has given a
voluntary confession or perceived himself or herself to be in custody, courts must
account for the cognitive differences and disparities in social and emotional
functioning that separate juveniles from adults. He asserts that children as young
as M.H. should be presumed as a class to be unable to give a voluntary statement,
because cognitive and behavioral science suggest that they are developmentally at
risk of providing an involuntary or false confession. Further, he contends that his
statement was made under highly coercive circumstances: his mother had taken him
to the interview, and she and Bradley were both authority figures; Bradley was a
former homicide detective who was trained in coercive interrogation techniques;
and M.H. had been separated from his mother at a government building staffed by
armed guards. Also, M.H. argues that children are in a state of perpetual custody
of parents, teachers, and others and that a child would not feel free to walk away
from an interview with a government worker; therefore, M.H. says, he was
subjected to a custodial interrogation.

{¶ 14} Additionally, M.H. claims that Bradley was acting as an agent of law
enforcement when she interrogated him. He notes that Bradley was a state actor
who was required by Ohio law to investigate allegations of child abuse and to report
the results of the investigation to law enforcement, and he asserts that she knew that
M.H.'s unwarned statements would be used in the police investigation and
subsequent prosecution. "[T]here is no legitimate purpose for the social worker's
interview of [M.H.]," he contends, "other than to directly assist the investigation of
law enforcement."

6

{¶ 15} The state responds that there is no evidence in the record showing that M.H. was ignorant of his rights, that Bradley coerced him into giving a statement, or that the interview was an inherently coercive interrogation. It contends that the law does not recognize a presumption that a child's statement is involuntary, and it says that M.H. wrongly conflates the fact that Bradley was an agent of the government as a child-protection specialist with her being an agent of law enforcement. The state opposes M.H.'s proposed per se rule that juveniles are perpetually in custody, arguing that the proper inquiry is whether the specific circumstances present a serious danger of coercion and that a child's age is only one factor in that inquiry. The state relies on this court's caselaw holding that an interview is not a custodial interrogation unless it is conducted by the police or under their direction or control, and, the state argues, there is no evidence that Bradley had authority to enforce laws and make arrests or that she was an agent of law enforcement.

{¶ 16} Accordingly, this case presents two related questions: First, is a child-abuse investigator employed by a county children-services agency required to provide the *Miranda* warnings before questioning a child suspected of committing child abuse? And second, does the Due Process Clause of the Fourteenth Amendment to the United States Constitution restrict the admission at trial of an incriminating statement made by a child suspect to a county child-abuse investigator during questioning?

## Law and Analysis

### *The Protection against Self-Incrimination*

{¶ 17} The Fifth Amendment to the United States Constitution provides that "[n]o person * * * shall be compelled in any criminal case to be a witness against himself." This right applies to state action through the Due Process Clause of the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 6, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). Moreover, "the constitutional privilege against self-incrimination is

applicable in the case of juveniles as it is with respect to adults." *In re Gault*, 387 U.S. 1, 55, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967); *accord In re C.S.*, 115 Ohio St.3d 267, 2007-Ohio-4919, 874 N.E.2d 1177, ¶ 72.

{¶ 18} The United States Supreme Court has "adopted a set of prophylactic measures designed to safeguard the constitutional guarantee against self-incrimination." *J.D.B. v. North Carolina*, 564 U.S. 261, 269, 131 S.Ct. 2394, 180 L.Ed.2d 310 (2011). In *Miranda*, the court held that prior to questioning, a suspect "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. at 444, 86 S.Ct. 1602, 16 L.Ed.2d 694. If these *Miranda* warnings are not given prior to a custodial interrogation, the prosecution may not use the statements obtained from the suspect at trial. *Id*. The court clarified, however, that by "custodial interrogation" it meant "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id*.

{¶ 19} This court has consistently held that the *Miranda* warnings are required only when the custodial interrogation is conducted by a law-enforcement officer or an agent of law enforcement. *E.g.*, *Jackson*, 154 Ohio St.3d 542, 2018-Ohio-2169, 116 N.E.3d 1240, at ¶ 15; *State v. Ferrette*, 18 Ohio St.3d 106, 108-109, 480 N.E.2d 399 (1985); *State v. Bolan*, 27 Ohio St.2d 15, 18, 271 N.E.2d 839 (1971). We have noted that the term "law-enforcement officer" includes an officer who has "a statutory duty to enforce laws and authority to arrest violators." *Jackson* at ¶ 27, citing R.C. 2901.01(A)(11) (defining "law enforcement officer"). And agents of law enforcement, we have explained, are " 'those acting for * * * law enforcement agencies by direction of the agencies" and do "not include private citizens not directed or controlled by a law enforcement agency, even though their

efforts might aid in law enforcement.' " (Emphasis deleted.) *Id*. at ¶ 15, quoting *Bolan* at 18.

{¶ 20} In *Jackson*, we considered whether a social worker employed by a children-services agency (as in this case, CCDFCS) was either a law-enforcement officer or an agent of law enforcement when interviewing an alleged perpetrator. *Id*. at ¶ 1. We rejected the proposition that a social worker's statutory duty to cooperate with and provide information to law enforcement regarding child-abuse investigations converts the social worker into an agent of law enforcement. *Id*. at ¶ 21-22. We explained that the CCDFCS social worker was not a law-enforcement officer, because she lacked the power to arrest, *id*. at ¶ 27, and that she was not an agent of law enforcement because she had not interviewed the suspect at the direction or control of the police, *id*. at ¶ 23. Therefore, we concluded, she was not required to give the *Miranda* warnings prior to interviewing the suspect in her child-abuse investigation. *Id*. at ¶ 28.

{¶ 21} Similarly here, Bradley was neither a law-enforcement officer nor an agent of law enforcement. As *Jackson* explains, her duties to investigate child abuse, to report her findings to police, and to cooperate in the criminal investigation did not make her an agent of law enforcement. She testified that she was not a law-enforcement officer and that she lacked the power to arrest. And although she admitted having a relationship with police, the evidence in this record shows that she did not operate under the direction or control of law enforcement: Detective Cottom testified that she had not directed Bradley to conduct the interview and did not even know that it had occurred until approximately two months later.

{¶ 22} Bradley's status as a former police officer is irrelevant. Because she was not a law-enforcement officer or an agent of law enforcement at the time of the interview, she was not required to advise M.H. of his *Miranda* rights. It is therefore unnecessary to decide whether M.H. was in custody at the time Bradley questioned him.

*The Federal Due-Process Protection against Coerced Confessions*

{¶ 23} In cases decided before and after the Fifth Amendment protection against self-incrimination was first applied to the states, the United States Supreme Court has analyzed the admissibility of a confession under the rubric of due process. *See Connelly*, 479 U.S. at 163-164, 107 S.Ct. 515, 93 L.Ed.2d 473. We have therefore explained that "[c]onstitutional principles of due process preclude the use of coerced confessions as fundamentally unfair, regardless of whether the confession is true or false." *State v. Barker*, 149 Ohio St.3d 1, 2016-Ohio-2708, 73 N.E.3d 365, ¶ 31.

{¶ 24} However, in defining the protections due process affords against coerced confessions, the Supreme Court has held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Connelly* at 167; *State v. Myers*, 154 Ohio St.3d 405, 2018-Ohio-1903, 114 N.E.3d 1138, ¶ 77; *accord Barker* at ¶ 31. "Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Connelly* at 164.

{¶ 25} In this case, obtaining M.H.'s confession was not causally related to police conduct. As explained above, Bradley was not a law-enforcement officer nor did she act under the direction or control of the police. Her status as a former police officer is irrelevant. Further, the evidence shows that neither Detective Cottom nor any other police officer was involved in Bradley's interview of M.H. And under the Supreme Court's holding in *Connelly*, which we are obligated to follow, the lack of a causal connection between police conduct and M.H.'s confession is fatal to his claim that his confession was coerced in violation of his federal due-process rights.

{¶ 26} The dissenting opinion maintains that "[n]othing in the Supreme Court's decision [in *Connelly*] suggests that the court intended its holding to

10

establish a per se rule that police coercion is the *only* type of state action that can violate a suspect's due-process rights in the confession context." (Emphasis sic.) Dissenting opinion at ¶ 53. The dissent asserts that the Supreme Court's reference in *Connelly* to "police activity" "could reflect the specific facts of that case." *Id.* at ¶ 54.

{¶ 27} However, we ought not assume that the court chose its words so carelessly. Moreover, dissenting in *Connelly*, Justice Brennan understood the majority to mean what it had said: "Today's decision restricts the application of the term 'involuntary' to those confessions obtained by police coercion. Confessions by mentally ill individuals or *by persons coerced by parties other than police officers* are now considered 'voluntary.' " (Emphasis added.) *Connelly*, 479 U.S. at 176, 107 S.Ct. 515, 93 L.Ed.2d 473 (Brennan, J., dissenting).

{¶ 28} Nor is our plain reading of the court's holding in *Connelly* inconsistent with *Estelle v. Smith*, 451 U.S. 454, 466-469, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), or *United States v. Mathis*, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968). Neither of those decisions discuss the due-process protection against coerced confessions. Rather, both of those cases involved the privilege against self-incrimination, and the court decided in both cases that incriminating statements were inadmissible because the interrogator had failed to obtain a waiver of the accused's *Miranda* rights.

{¶ 29} Moreover, the court in *Estelle* noted that the psychiatrist had acted as an agent of law enforcement, *Estelle* at 467, whereas in *Mathis*, "the court 'was *not* called upon to decide whether the IRS employee was a "law enforcement agent," as the government apparently ceded that point.' (Emphasis sic.)," *Jackson*, 154 Ohio St.3d 542, 2018-Ohio-2169, 116 N.E.3d 1240, at ¶ 25, quoting *State v. Bernard*, 31 So.3d 1025, 1030 (La.2010).

{¶ 30} But even if there were some inconsistency between *Connelly* and these decisions, the Supreme Court has explained that when precedent appears to

be in conflict, lower courts "should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989). *Connelly*, not *Estelle* or *Mathis*, directly controls here.

{¶ 31} In any case, it is not obvious that the Supreme Court intended the due-process protection against coerced confessions to apply to state employees who are not law-enforcement authorities.

{¶ 32} The Due Process Clause precludes the admission of coerced statements "not because such confessions are unlikely to be true but because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system." *Rogers v. Richmond*, 365 U.S. 534, 540-541, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961). "It also turns on the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves." *Spano v. New York*, 360 U.S. 315, 320-321, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959).

{¶ 33} It was "the advent of modern custodial police interrogation" that brought "an increased concern about confessions obtained by coercion." *Dickerson v. United States*, 530 U.S. 428, 434-435, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). The Supreme Court adopted the suppression remedy to deter law enforcement from violating the due-process rights of criminal suspects by making confessions obtained from them through the use of coercive investigatory techniques inadmissible at trial. *See id.*; *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 349, 126 S.Ct. 2669, 165 L.Ed.2d 557 (2006). Application of the exclusionary rule depends on whether "[t]he line between proper and permissible police conduct and techniques and methods offensive to due process" has been crossed. *Haynes v. Washington*, 373 U.S. 503, 515, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963). M.H. does

not point to a single case in which the United States Supreme Court held that a confession obtained by a public employee who was not a member of law enforcement must be suppressed as violative of due process.

{¶ 34} The Supreme Court has never repudiated or limited its holding in *Connelly*, nor is that holding an outlier. In discussing the test for whether a confession has been coerced in violation of a suspect's due-process rights, the court has pointed to "the crucial element of police coercion." *Withrow v. Williams*, 507 U.S. 680, 693, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993), *see also State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 71 ("the use of an inherently coercive tactic by police is a prerequisite to a finding of involuntariness").

{¶ 35} And in *Perry v. New Hampshire*, the court held that "the Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances *arranged by law enforcement*." (Emphasis added.) 565 U.S. 228, 248, 132 S.Ct. 716, 181 L.Ed.2d 694 (2012). Justice Ginsburg, writing for the court, explained that the aim of this rule was "to deter police from rigging identification procedures," so that "[w]hen no improper law enforcement activity is involved," the reliability of the identification may be challenged through the rights and opportunities made available to the accused, such as the right to counsel, cross-examination, and a verdict supported proof of guilt beyond a reasonable doubt. *Id*. at 233.

{¶ 36} Applying the plain language of the Supreme Court's holding in *Connelly*, we conclude that in this case, there was no "coercive police activity," which "is a necessary predicate to the finding that a confession is not 'voluntary,' " 479 U.S. at 167, 107 S.Ct. 515, 93 L.Ed.2d 473.

*M.H.'s Statement Was Not Coerced*

{¶ 37} Assuming for the sake of argument that Bradley's position as a county employee triggered due-process protections when she interviewed M.H., the

incriminating statements he made would not be involuntary in the constitutional sense.

{¶ 38} The Supreme Court has applied the Due Process Clause of the Fourteenth Amendment to examine "the circumstances of interrogation to determine whether the processes were so unfair or unreasonable as to render a subsequent confession involuntary." *Michigan v. Tucker*, 417 U.S. 433, 441, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974). The court established a procedural safeguard to ensure that "tactics for eliciting inculpatory statements * * * fall within the broad constitutional boundaries imposed by the Fourteenth Amendment's guarantee of fundamental fairness." *Miller v. Fenton*, 474 U.S. 104, 110, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985). Confessions obtained using interrogatory techniques that offend the standards of fundamental fairness under the Due Process Clause may not be used in court against the accused. *Tucker* at 441.

{¶ 39} An interrogator's use of " 'an inherently coercive tactic (*e.g.*, physical abuse, threats, deprivation of food, medical treatment, or sleep)' " triggers the due-process analysis of the totality of the circumstances. *State v. Osie*, 140 Ohio St.3d 131, 2014-Ohio-2966, 16 N.E.3d 588, ¶ 93, quoting *State v. Clark*, 38 Ohio St.3d 252, 261, 527 N.E.2d 844 (1988). Those circumstances include "the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Myers*, 154 Ohio St.3d 405, 2018-Ohio-1903, 114 N.E.3d 1138, ¶ 77.

{¶ 40} The record in this case reveals that M.H.'s mother brought him to CCDCFS to be questioned and that Bradley separated him from his mother, took him to a room, and closed the door. Neither M.H. nor his mother objected. Bradley did not inform M.H. of his right to stay silent or to end the interview, and she asked M.H. questions that he answered. On cross-examination of Bradley at the suppression hearing, M.H. did not elicit any testimony from Bradley that there were

any improper threats, inducements, deprivations, mistreatment, or restraints, and the "interrogation" involved a single session lasting approximately 40 minutes. Further, M.H. did not take the stand to present evidence that his incriminating statement was coerced.

{¶ 41} M.H. fails to demonstrate that this interview offends notions of fundamental fairness, and instead, he seeks a per se rule that any questioning of a 13-year-old child is presumptively coercive based on a child's degree of cognitive and behavioral development. However, that claim is no different from the argument rejected in *Connelly* that the accused's mental illness rendered his confession to police involuntary as a matter of psychological fact. Without any overreaching by Bradley, M.H. cannot establish that his confession was involuntary for purposes of due process.

### Conclusion

{¶ 42} Absent evidence that a child-abuse investigator employed by a county children-services agency is a law-enforcement officer or an agent of law enforcement acting under the direction or control of the police, an interrogation is not subject to the strictures of the Supreme Court's decision in *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602, 16 L.Ed.2d 694, nor does federal due process restrict the admission at trial of an incriminating statement made to the investigator during that questioning.

{¶ 43} Because the child-abuse investigator in this case was neither a law-enforcement officer nor acting under the direction or control of the police, she was not required to provide M.H. with the *Miranda* warnings and his confession was not obtained in violation of his due-process rights. The court of appeals correctly determined that the trial court erred in suppressing his statement to the investigator.

{¶ 44} We therefore affirm the judgment of the Eighth District Court of Appeals.

Judgment affirmed.

FISCHER and DEWINE, JJ., concur.

FRENCH, J., concurs in judgment only.

STEWART, J., dissents, with an opinion joined by O'CONNOR, C.J., and DONNELLY, J.

_____

**STEWART, J., dissenting.**

{¶ 45} I agree with the majority that the child-abuse investigator, Esther Bradley, did not have to give *Miranda* warnings to appellant, M.H., prior to interrogating him in this case. The requirement under *Miranda v. Arizona* that the police inform criminal suspects of their rights, including their right to remain silent, is borne out of a recognition that custodial police interrogations are inherently coercive. 384 U.S. 436, 467, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The warnings are designed both to combat the coercive nature of custodial police interrogations and to give suspects an awareness of the Fifth Amendment privilege against self-incrimination so they have a full opportunity to exercise it. *Dickerson v. United States*, 530 U.S. 428, 440, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000), citing *Miranda* at 467. *Miranda*'s requirements generally do not apply if either the suspect is not in custody or the interrogator is not an agent of law enforcement. *Oregon v. Mathiason*, 429 U.S. 492, 494-495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (law enforcement not required to administer *Miranda* warnings when suspect is not in custody); *State v. Watson*, 28 Ohio St.2d 15, 275 N.E.2d 153 (1971), paragraph five of the syllabus ("*Miranda* requirements do not apply to admissions made to persons who are not officers of the law or their agents"). *But see Estelle v. Smith*, 451 U.S. 454, 467, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) (holding that *Miranda* warnings were required to be given by a psychiatrist before conducting a court-ordered psychiatric exam of a defendant being held in county jail because "[t]he considerations calling for the accused to be warned prior to custodial interrogation apply with no less force to the pretrial psychiatric examination at issue here").

16

Because precedent of this court establishes that Bradley was not a law-enforcement officer or acting at the direction of law enforcement when she interrogated M.H. pursuant to her statutory duty to investigate, *see State v. Jackson*, 154 Ohio St.3d 542, 2018-Ohio-2169, 116 N.E.3d 1240, ¶ 30, I agree with the majority's determination that Bradley was not required to administer *Miranda* warnings to M.H.

{¶ 46} I nonetheless disagree with the lead opinion's conclusion that the lack of police involvement in this case is fatal to M.H.'s due-process claim. The Due Process Clause of the Fourteenth Amendment to the United States Constitution protects a defendant from coercive state action that results in an involuntary confession. It is not limited to coercive actions taken by police. Because Bradley is unquestionably a state actor and because I believe that the evidence shows she acted coercively to obtain involuntary statements from M.H., I would reverse the judgment of the Eighth District Court of Appeals and would reinstate the trial court's suppression order on the grounds that the use of M.H.'s involuntary statements at trial would violate his due-process rights.

## I. Federal Due-Process Protections Apply Because Bradley Is a State Actor who Purposefully Sought Incriminating Information from M.H.

{¶ 47} I disagree with the lead opinion's determination that the United States Supreme Court's holding in *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), restricts Fourteenth Amendment due-process protections to cases involving involuntary statements procured through coercive police conduct.

### A. *The lead opinion misreads* Connelly

{¶ 48} The question before the court in *Connelly* was whether the prosecution's use of a defendant's random, unsolicited murder confession to a police officer violated the defendant's due-process rights. When Connelly confessed, he was not a suspect in the case and had not been contacted by police.

Rather, Connelly had devised a plan to confess to police after a schizophrenia-induced voice, which he believed was the "voice of God," told him to confess. *Id.* at 161.

**{¶ 49}** To carry out the confession, Connelly flew from his home in Boston to Denver, where the murder had taken place nine months earlier. Once there, Connelly approached a uniformed police officer who was working in an off-duty capacity in downtown Denver. Without any prompting, Connelly told the officer that he had murdered someone and wanted to confess. The officer immediately advised Connelly that he had the right to remain silent, that anything he said could be used against him in court, and that he had the right to an attorney prior to any questioning by police. Connelly stated that he understood his rights but still wanted to talk to the officer about the murder because his conscience had been weighing on him.

**{¶ 50}** After being informed of his rights a second time, Connelly was taken to police headquarters. Once there, he proceeded to give a more detailed confession to the murder. Officers fact-checked his confession and determined that the body of an unidentified woman had been discovered four months earlier. Connelly continued to provide details of the murder and even agreed to take officers to the scene of the crime. Based on Connelly's behavior throughout the course of his interactions with the police, the police did not believe that he was suffering from any kind of mental illness. It was not until the next day, during an interview by the public defender's office, that Connelly explained that "voices" had told him to confess. *Id.*

**{¶ 51}** In reviewing these facts, the Supreme Court of Colorado held that Connelly's confession was involuntary because, given his mental illness, it was not the product of rational thought and free will. Importantly, the Supreme Court of Colorado determined that the state-action requirement of the Fourteenth

18

Amendment was satisfied by virtue of the admission of the confession as evidence of Connelly's guilt at trial. 479 U.S. at 162, 107 S.Ct. 515, 93 L.Ed.2d 473.

{¶ 52} The Supreme Court of the United States reversed the Colorado high court's decision after recognizing that the off-duty police officer in the case had done absolutely nothing to provoke, coerce, or even solicit Connelly's confession—even if, given Connelly's schizophrenia, the confession was not a product of his freely exercised will. Specifically, the court stated:

> Our "involuntary confession" jurisprudence is entirely consistent with the settled law requiring some sort of "state action" to support a claim of violation of the Due Process Clause of the Fourteenth Amendment. * * *
>
> The difficulty with the approach of the Supreme Court of Colorado is that it fails to recognize the essential link between coercive activity of the State, on the one hand, and a resulting confession by a defendant, on the other.

*Id*. at 165. The court in *Connelly* made clear that the state's role in the admission of a confession at trial is not enough to satisfy the Fourteenth Amendment's state-action requirement. Rather, due-process scrutiny is required only when the state action *in procuring the confession* is coercive. *See id*. at 166-167.

{¶ 53} Given that the overall context of *Connelly* discusses the need for coercive "state action" that results in an involuntary statement, it is imprudent for the lead opinion to conclude that due-process scrutiny applies only to state action by the police. Nothing in the Supreme Court's decision suggests that the court intended its holding to establish a per se rule that police coercion is the *only* type of state action that can violate a suspect's due-process rights in the confession context. Besides, such a narrow reading of the court's holding in *Connelly* would

undermine the purpose of the due-process protection in the first place—namely, to protect us from the government's use of "constitutionally impermissible methods" to obtain a confession, *Rogers v. Richmond*, 365 U.S. 534, 541, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961). As the Supreme Court stated in the first case in which it applied that due-process protection to the states, "[t]he due process clause requires 'that state action, *whether through one agency or another*, shall be consistent with the fundamental principles of liberty and justice which lie at the base of all our civil and political institutions.' " (Emphasis added.) *Brown v. Mississippi*, 297 U.S. 278, 286, 56 S.Ct. 461, 80 L.Ed. 682 (1936), quoting *Hebert* v. *Louisiana*, 272 U.S. 312, 316, 47 S.Ct. 103, 71 L.Ed. 270 (1926); *see Malloy v. Hogan*, 378 U.S. 1, 6, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). Moreover, both the Supreme Court and this court have previously suppressed confessions extracted by nonpolice state actors when the circumstances surrounding the confessions showed they were compelled and therefore involuntary. *See Estelle*, 451 U.S. at 466-469, 101 S.Ct. 1688, 68 L.Ed.2d 359 (holding that admission at trial of confession obtained by court-appointed psychiatrist violated defendant's right not to incriminate himself); *United States v. Mathis*, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968) (holding that incriminating statements extracted by Internal Revenue Service agent should have been suppressed);[1] *Spano v. New York*, 360 U.S. 315, 319, 79 S.Ct. 1202, 3 L.Ed.2d

1. The lead opinion's efforts to distinguish *Estelle* and *Mathis* are unpersuasive. It does not matter that both cases were decided on grounds concerning the Fifth Amendment privilege against compulsory self-incrimination, because it is the privilege against self-incrimination that animates the due-process protection. *See Davis v. North Carolina*, 384 U.S. 737, 740, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966) ("The standard of voluntariness which has evolved in state cases under the Due Process Clause of the Fourteenth Amendment is the same general standard which applied in federal prosecutions—a standard grounded in the policies of the privilege against self-incrimination"). Nor is it true that the court in *Estelle* found the psychiatrist to be an agent of law enforcement. What the court said was that the psychiatrist was acting as "an agent of the State" when recounting unwarned statements made to him during a court-ordered competency investigation. *Estelle*, 451 U.S. at 467, 101 S.Ct. 1866, 68 L.Ed.2d 359.

   Moreover, despite this court's reliance in *Jackson*, 154 Ohio St.3d 542, 2018-Ohio-2169, 116 N.E.3d 1240, on certain statements made by the Supreme Court of Louisiana regarding *Mathis*,

1265 (1959) (reversing conviction based on involuntary confession extracted by assistant district attorney); *State v. Roberts*, 32 Ohio St.3d 225, 513 N.E.2d 720 (1987), syllabus (affirming reversal of conviction following admission of incriminating statements extracted by probation officer).

{¶ 54} Given the Supreme Court's prior decisions in the involuntary-confession context, I find that the court's reference in *Connelly* to "police activity" has a meaning different from the one the lead opinion gives it. For instance, the court's reference to "police activity" could reflect the specific facts of that case—that the state actor and passive recipient of Connelly's confession happened to be a police officer. *See State v. Evans*, 144 Ohio App.3d 539, 561-562, 760 N.E.2d 909 (1st Dist.2001) (reaching this conclusion). Had the passive recipient of Connelly's confession been the city's mayor or the district attorney or some other government employee, the court's analysis would not have been any different. That is because the court's judgment reversing the judgment of the Colorado Supreme Court was based on the absence of government coercion and not the title or designation of the state actor involved.

---

there is no indication in the decision that the government conceded that the IRS civil investigator who extracted the incriminating statements was an agent of law enforcement. In fact, whether the IRS civil investigator was an agent of law enforcement seems to have been of little consequence to the court given that the agent was nevertheless a government actor questioning a person in state custody about facts that had the potential to lead to a criminal prosecution. *See id.* The Louisiana Supreme Court's assertion that the government "apparently ceded the point" that the IRS civil investigator was an agent of law enforcement seems to have rested on the premise that *Miranda*'s requirements apply only to law enforcement, *see State v. Bernard*, 31 So.3d 1025, 1030 (La.2010), but in light of *Estelle*, that is not always true.

And lastly, this dissenting opinion does not state that *Estelle* and *Mathis* are controlling in this matter. These decisions are offered to refute the lead opinion's assertion—based on little more than a statement in *Connelly* taken out of context—that only police coercion can count in the involuntary-confession context. At the very least, *Estelle* and *Mathis* call this position into serious question, and they would be inconsistent with *Connelly*—and *Connelly* would control—only if one assumes what the lead opinion has not shown—that *Connelly* established a per se rule that due-process protections apply to limit only the coercive conduct of state actors who are police. Indeed, the lead opinion tacitly acknowledges its shortcomings in this regard because even after all the arguments it makes against the application of due-process scrutiny, the lead opinion reluctantly—albeit in an overly simplified fashion—conducts a totality-of-the-circumstances analysis anyway.

{¶ 55} A better explanation is that "police activity" means something broader than the actions taken by those who are actually police officers or their agents. Indeed, this interpretation of *Connelly* is not unique. Several federal and state courts have agreed that the due-process voluntariness inquiry is not limited to cases involving confessions made to the police. *See*, *e.g.*, *United States v. D.F.*, 63 F.3d 671, 680 (7th Cir.1995), *vacated and remanded on other grounds*, 517 U.S. 1231, 116 S.Ct. 1872, 135 L.Ed.2d 169 (1996); *Luna v. Massachusetts*, 354 F.3d 108, 111 (1st Cir.2004); *Running v. United States*, D.S.D. No. 3:13-CV-03007-RAL, 2016 U.S. Dist. LEXIS 70541, *16-17 (May 31, 2016); *United State v. Codrington*, E.D.N.Y. No. 07 MJ 118, 2008 U.S. Dist. LEXIS 35859, *29-30 (May 1, 2008); *In re Timothy C.*, 194 Ariz. 159, 978 P.2d 644, ¶ 14 (Ariz.App.1998); *State v. Bright*, 683 A.2d 1055, 1060 (Del.Sup.Ct.1996). Instead, these courts and others have taken the position that for due-process protections to apply, the interrogation "must be at the hands of a government actor whose questioning is of a nature that reasonably contemplates criminal prosecution." *United States v. D.F.*, 115 F.3d 413, 420 (7th Cir.1997). In other words, "the state actor's questioning of the defendant must have as one of its purposes, definitive or contingent, the use of the statement in a criminal prosecution." (Footnote omitted.) *D.F.*, 63 F.3d at 684. Usually, the "state actor[ ] questioning * * * the defendant" with the purpose of "us[ing] * * * the statement in a criminal prosecution" will be a police officer. But not always—and not here.

### B. *Bradley, although not a police officer, is clearly a state actor within the meaning of* Connelly *(as properly understood)*

{¶ 56} In this case, Bradley, a child-abuse investigator, was acting in her official capacity as an agent of Cuyahoga County in the Sex Abuse Intake Unit of the Cuyahoga County Department of Children and Family Services ("CCDCFS") when she questioned M.H. In this capacity, Bradley had a statutory duty to

investigate reports of child abuse and to report her findings to law enforcement. *See* R.C. 2151.421(G)(1).

{¶ 57} At the suppression hearing, Bradley acknowledged that at her first meeting with the alleged victim and her mother in late September 2015, she advised the alleged victim's mother to file a police report. Bradley also admitted that at the time she questioned M.H. in early December 2015, she knew that a police report had been filed, that a detective had been assigned to the case, and that criminal charges were, as she put it, a "strong possibility." In fact, Bradley testified that one of her primary purposes for questioning M.H. was to find out whether he had engaged in any *criminal* sexual activity with the alleged victim and, if so, to pass that information on to law enforcement.

{¶ 58} The record further shows that although Cleveland Police Detective Christina Cottom had been assigned to the case since mid-October 2015, she never conducted her own interview of the alleged victim or M.H. Instead, Detective Cottom's investigation relied on the interviews Bradley had conducted. And although Detective Cottom testified that she had neither directed nor controlled Bradley's interviews, she also testified that the arrangement between police and CCDCFS was such that she knew that she would be provided with Bradley's write-up of her investigation and that it would be used in furtherance of the criminal investigation. These facts demonstrate that Bradley's questioning of M.H. was designed in large part to assist the state in its investigation and prosecution of M.H. Accordingly, I would conclude that the Due Process Clause of the Fourteenth Amendment, which protects us from the admission of involuntary statements as evidence at trial, *see Rogers*, 365 U.S. at 540, 81 S.Ct. 735, 5 L.Ed.2d 760, is implicated here.[2]

---

2. The lead opinion places undue emphasis on the fact that the United States Supreme Court's involuntary-confession jurisprudence has focused almost exclusively on police action. I do not

## II. M.H.'s Statements to Bradley Were Involuntary

{¶ 59} When a defendant challenges the voluntariness of a confession, the prosecution has the burden of establishing that the confession was voluntarily made, in view of the totality of the circumstances. *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, ¶ 194. Among other relevant factors, courts must consider " 'the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of [the] interrogation; the existence of physical deprivation or mistreatment; and the existence of [a] threat or inducement.' " *Id.*, quoting *State v. Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus, *sentence vacated on other grounds*, 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155 (1978). Moreover, when a confession is extracted from a juvenile without the benefit of counsel, "the *greatest* care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent

---

dispute this, nor is this surprising. It is the duty of law-enforcement officials to detect and investigate crimes. It would be highly unusual for a state actor of a different sort to randomly pick up a mantle specifically reserved for law enforcement, unless required to do so—which is precisely the situation we have before us. In Ohio, R.C. 2151.421(G)(1) does not merely authorize children-services agents to conduct investigations related to allegations of child abuse; the statute *requires* them to do so— and then *requires* them to report those findings to law enforcement. In this limited way, the Ohio General Assembly requires children-services agents to act in ways that mirror the investigative actions typically reserved for law enforcement.

If a certain state actor is authorized to act in a way that mirrors law enforcement and that person wrings a confession out of the mouth of a suspect so that it may later be used against the suspect at trial, that action should be subject to constitutional scrutiny. The lead opinion offers no clear doctrinal explanation for rejecting that conclusion, because there is none.

Imagine that Bradley had beaten M.H. until he finally relented and confessed to the crime, like the police did in *Brown*, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682, the first case in which the United States Supreme Court found a confession to be involuntary under the Due Process Clause of the Fourteenth Amendment. Or imagine that she had explicitly threatened to have M.H. removed from his mother's home if he did not confess—conduct similar to the actions taken by police in *Lynumn v. Illinois*, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963), another case in which the United States Supreme Court found a due-process violation. What the lead opinion says today is that even if Bradley had engaged in such conduct, the state could still use M.H.'s confession against him at trial without violating his due-process rights—not because M.H.'s statements were actually voluntary but because Bradley is not a police officer or an agent of law enforcement. Such an analysis completely parts ways with logic.

fantasy, fright or despair." (Emphasis added.) *In re Gault*, 387 U.S. 1, 55, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). In light of the totality of the circumstances surrounding Bradley's interrogation of M.H., it strains credulity to say that M.H.'s statements to her were voluntary. *See Dickerson*, 530 U.S. at 434, 120 S.Ct. 2326, 147 L.Ed.2d 405, quoting *Stein v. New York*, 346 U.S. 156, 185, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953) (the voluntariness determination " 'depends upon a weighing of the circumstances of pressure against the power of resistance of the person confessing' ").

### A. *M.H. was never advised of his rights, and the record does not show that he understood them*

{¶ 60} The record is devoid of any evidence showing that Bradley, or anyone else for that matter, made sure that the juvenile M.H. knew that he *had* rights—much less that he understood them. Nor did Bradley ever directly communicate with M.H. prior to the questioning, and she never informed him of the serious allegations against him—a violation of the same statute that authorized Bradley's investigation. R.C. 2151.421(G)(1) ("A representative of the public children services agency shall, at the time of initial contact with the person subject to the investigation, inform the person of the specific complaints or allegations made against the person"). In fact, at no point during the questioning did Bradley even explain to M.H. why he was in the interrogation room with her. Along the same lines, Bradley testified that she did not administer *Miranda* warnings to M.H. or otherwise attempt to explain to him in more basic terms that he had the right not to speak to her. According to Bradley, it was her understanding that she did not have to inform M.H. of his rights because she was not a member of law enforcement.

{¶ 61} It appears that before the interrogation, Bradley did, to some extent, inform M.H.'s mother that sexual-assault allegations had been levied against her son. Nevertheless, the testimony given at the suppression hearing reveals that

Bradley failed to candidly inform M.H.'s mother about the nature of the questioning she intended to conduct. Bradley initiated contact with M.H.'s mother by leaving a letter at her residence when she was not home. This letter was cryptic and vague, stating merely that M.H. had been named in an open sex-abuse investigation with CCDCFS and that Bradley needed to speak with him about the allegations. The letter also contained a specific date and time for M.H.'s mother to bring M.H. in for questioning.

{¶ 62} It is clear from M.H.'s mother's testimony that she did not view the already scheduled questioning as something that was optional for her and her son. When M.H.'s mother called Bradley to discuss the letter, Bradley told M.H.'s mother that her questioning of M.H. would be "private," without ever disclosing that she was duty-bound to report M.H.'s answers to law enforcement. M.H.'s mother testified that had she known "private" meant that she would not be allowed in the room with her child during the questioning, she would not have allowed the questioning to proceed without first getting her child an attorney. Furthermore, M.H.'s mother testified that she did not become aware of CCDCFS's standard practice of not allowing parents in the interrogation room until she arrived at the county building with her son, at which point she felt that she could not stop the questioning from proceeding because her son was already there.

{¶ 63} I agree with the conclusion reached in the concurring opinion in the court of appeals that the record shows that M.H.'s mother understood Bradley's statement regarding the "private" nature of the questioning to be an assurance that Bradley would not be sharing the information that she obtained from the questioning with anyone else—least of all law enforcement. *See* 2018-Ohio-4848, ¶ 46 (Keough, J., concurring). Accordingly, even if M.H.'s mother relayed to him what little information Bradley had provided to her, it is doubtful that this information by itself would have made M.H. aware of the seriousness of the

allegations against him or the fact that anything he said to Bradley could be used against him in a delinquency proceeding.

{¶ 64} Rather than point to affirmative evidence in the record establishing that M.H. knew his rights and freely chose to waive them, the state takes the position that nothing in the record shows that M.H. was in fact ignorant of his rights. This position is both legally and factually unsound. To start with, it is the *state* that has the burden of establishing the voluntariness of an inculpatory statement if it wishes to use the statement at trial. *Missouri v. Seibert*, 542 U.S. 600, 608, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004) (lead opinion), fn. 1, citing *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). An alleged *lack of evidence* as to whether a suspect knew and understood his rights is not proof of voluntariness. Furthermore, that M.H. was never informed of his rights prior to the questioning and was only 13 years old at the time of the questioning *is* evidence that M.H. did not know or understand the rights he was giving up by answering Bradley's questions. This evidence, in turn, weighs against voluntariness. *See Escobedo v. Illinois*, 378 U.S. 478, 499, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) (White, J., dissenting) ("The failure to inform an accused that he need not answer and that his answers may be used against him is very relevant indeed to whether the disclosures are compelled"). And although the state takes the position that any ignorance on the part of M.H.'s mother regarding her son's rights should not be imputed to him, the fact that M.H.'s mother—an adult who was better informed— lacked a sufficient understanding of M.H.'s rights also weighs against determining that he knew and understood his rights at the time of the interrogation. Based on this evidence, I would conclude that M.H.'s statements were not voluntarily made with knowledge of the rights he was forfeiting by talking to Bradley.

*B. The setting was highly coercive*

{¶ 65} I would also conclude that the setting of the interrogation and the circumstances leading up to it produced what would be an inherently coercive

environment to a 13-year-old child—one where M.H. would not have felt free to ignore Bradley's questions and/or leave the interrogation room. The interrogation took place in a government building in which police officers were present. M.H. had no prior contact with Bradley before arriving at the building, and soon after arriving, he was taken away from his mother and escorted to a secluded room to be questioned behind closed doors by a total stranger. His mother was not permitted to be in the room during the interrogation, and there was no adult present to represent M.H.'s interests or act as an intermediary between him and his interrogator.

{¶ 66} Additionally, Bradley was not merely an ordinary case worker. She was a case worker who had been professionally trained in law enforcement. As her testimony at the suppression hearing revealed, Bradley had spent more than ten years working for the Atlanta police department prior to joining CCDCFS. She spent three of those years working as a general investigator and the last one and a half years in the homicide unit. Her testimony also revealed that in general, she would begin her questioning with "rapport building questions" and that in this case, she asked M.H. about his birthday, his school, and some of his favorite things. Thereafter, her questioning of M.H. became more direct, moving on to the purpose of the interrogation.

{¶ 67} In this case, Bradley proceeded to ask M.H. several direct questions about his prior sexual activity. It must be noted that although Bradley's job title at CCDCFS was child-protection specialist and she was not an employee of a law-enforcement agency, both the interrogation atmosphere and Bradley's structuring of her questions are strikingly similar to the type of police interrogation practices that the Supreme Court found inherently coercive in *Miranda*. *See* 384 U.S. at 449-452, 86 S.Ct 1602, 16 L.Ed.2d 694, and fn. 9 (citing police manuals directing officers to isolate the suspect by conducting the interrogation in a location unfamiliar to the suspect and away from the suspect's family and friends, then to

28

begin with more sympathetic relationship-building questions before moving on to more hostile questioning). Under these circumstances, a 13-year-old child would not have felt he had any choice but to remain in the closed room and answer Bradley's questions. In fact, the record reveals that once Bradley returned M.H. to his mother following the interrogation, M.H. appeared quiet and nervous—suggesting that his admissions were not voluntary.

### C. Bradley coercively co-opted M.H.'s mother in her plan

{¶ 68} Furthermore, the way that Bradley went about scheduling the interrogation suggests that she intentionally took advantage of M.H.'s mother's parental authority to obtain M.H.'s cooperation. Bradley chose to communicate only with M.H.'s mother without verifying that M.H. was willing to speak with her. In other words, it was M.H.'s mother, not M.H., who agreed to the questioning, and it was she, not he, who agreed to go to the county building for the questioning. Bradley allowed M.H.'s mother to make these arrangements for her son, while choosing not to notify M.H.'s mother that a police report had been filed, that she had a duty to report the results of her investigation to the police, or that there was no requirement that M.H. ever speak with her in the first place. Under these circumstances, I cannot agree with the state's position that M.H. had the agency to make a free and voluntary statement to Bradley, when he never had a choice whether to attend the interrogation.

### III. Conclusion

{¶ 69} For the foregoing reasons, I would conclude that this case implicates the Due Process Clause's protection against coercive state action because Bradley is a state actor who purposefully sought incriminating information from M.H. I would further conclude that under the totality of the circumstances—which include M.H.'s age, his lack of understanding of his rights, and Bradley's failure to candidly inform M.H.'s mother of the nature of the questioning—the statements that M.H. made during the course of the interrogation were involuntary. Accordingly, I would

reverse the judgment of the Eighth District Court of Appeals and would reinstate the trial court's suppression order on the grounds that the admission of M.H.'s involuntary statements at trial would violate his due-process rights.

O'CONNOR, C.J., and DONNELLY, J., concur in the foregoing opinion.

_____

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Jennifer M. Meyer and Anthony T. Miranda, Assistant Prosecuting Attorneys, for appellee.

Mark A. Stanton, Cuyahoga County Public Defender, and Paul A. Kuzmins, Assistant Public Defender, for appellant.

Dave Yost, Attorney General, Benjamin M. Flowers, State Solicitor, and Samuel C. Peterson, Deputy Solicitor, urging affirmance for amicus curiae Attorney General Dave Yost.

Juvenile Law Center and Marsha L. Levick; and Ballard Spahr, L.L.P., and Lisa B. Swaminathan, urging reversal for amicus curiae Juvenile Law Center.

_____