[Cite as *State v. Farra*, 2022-Ohio-1421.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28950 |
| | : | |
| v. | : | Trial Court Case No. 2020-CR-208/2 |
| | : | |
| BILLY JOE FARRA | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

· · · · · · · · · · ·

O P I N I O N

Rendered on the 29th day of April, 2022.

· · · · · · · · · · ·

MATHIAS H. HECK, JR. by LISA M. LIGHT, Atty. Reg. No. 0097348, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

CARLO C. MCGINNIS, Atty. Reg. No. 0019540, 55 Park Avenue, Dayton, Ohio 45419
        Attorney for Defendant-Appellant

· · · · · · · · · · · · ·

EPLEY, J.

{¶ 1} After a multi-day bench trial, Defendant-Appellant Billy Joe Farra was found guilty of eleven felony counts and sentenced to 55 to 60½ years in prison, classified as a violent offender, and ordered to pay restitution. He now appeals from that conviction. For the reasons that follow, the judgment of the trial court will be affirmed.

## I. Facts and Procedural History

{¶ 2} An 85-year-old widower, Eugene Deaton, lived alone in his Wileray Avenue home in Miamisburg and often played the slot machines at two local racinos, Miami Valley Gaming in Monroe and Hollywood Casino in Dayton. On January 11, 2020, Deaton was playing slots at Hollywood Casino when Jessica Boomershine approached him and asked if he was having any luck. He answered in the negative, and she responded that she was not either, commenting, "I'm broke, hungry, and homeless." Trial Tr. at 116. Deaton offered to take her to his house for some food and a shower. Boomershine took him up on the offer, and the two left the casino in Deaton's car.

{¶ 3} The pair went back to Deaton's house, where Boomershine ate a sandwich, took a shower, and according to trial testimony, performed oral sex on Deaton. The following morning, the two exchanged numbers (Boomershine left hers on a post-it note), and then Deaton drove Boomershine back to the casino and gave her $10. The next day, Boomershine showed up at Deaton's house again, stayed for an indeterminate length of time, and then Deaton took her back to Hollywood Casino. She called again that evening, but Deaton told her he could not help. Boomershine again came to Deaton's house

unannounced, but this time he told her that if she did not leave, he would notify the police.

{¶ 4} On the evening of January 15, 2020, Deaton came home from the casino and went to bed around 9 p.m. Shortly thereafter, he was awakened by a bright light shining in his eyes; a strange man with a gun was standing over his bed. The man put the gun to Deaton's neck and told him to stay still. Deaton, however, reached for his gun, a .38 Smith & Wesson revolver that he kept near his bed. The man, who was later identified as Farra, got to the gun first and fired a shot into the pillow only inches from Deaton's head. The bullet went through the pillow and ricocheted off the wall. Farra then jammed the gun against Deaton's throat and demanded to know where his billfold was; Deaton replied that it was in the top drawer of his dresser.

{¶ 5} Next, Farra got Deaton out of bed and began to ransack the house with the help of his accomplice, Boomershine. Deaton was led out of the bedroom and made to lay down on the hallway floor. After a short time on the floor, Deaton's hands were tied up, and he was taken to his car, where the intruders put a covering over his head and forced him to lay face down on the backseat floorboard. Once in the car, Boomershine drove and Farra was positioned in the backseat to control Deaton.

{¶ 6} Boomershine and Farra demanded that Deaton reveal his ATM pin and his Social Security number. Deaton initially gave his captors a fake number, but after being beaten with the gun again and having it shoved in his mouth, Deaton told them the real information. They then stopped at an ATM and withdrew money.

{¶ 7} As they were driving, Deaton made the decision to fight back and try to dispossess the gun from Farra. That choice backfired, however. Deaton was left with

severely injured arms which resulted in surgeries and skin grafts. The altercation also led Farra to direct Boomershine to stop the car so he could more definitively deal with Deaton. Resultantly, Farra removed one of Deaton's socks and put it in his mouth as a gag, and then stuffed Deaton in the trunk.

{¶ 8} After driving around some more, Boomershine headed to Hollywood Casino and dropped herself off. With Deaton securely in the trunk, Farra then drove to the nearby CSX railyard to dump evidence. Deaton felt the car come to a stop again and heard a door open and close. After waiting five or ten minutes to make sure his captors were gone, Deaton pulled the emergency trunk release and emerged to find himself in a giant Rumpke recycling center. Because it was the middle of the night, the facility was completely empty, so Deaton wandered around looking for a phone to call for help. The facility's surveillance video showed him with only one sock, bloody clothes, and injuries to his arms, face, and neck.

{¶ 9} Eventually, Deaton found the break room and waited for an employee to arrive. At around 3:20 a.m., Marc Hyer arrived for work and called the police. Medics were called as well. Hyer testified: "I found the gentleman at the table all bleeding. His arms was [sic] wide open." Trial Tr. at 336. An officer who responded to the scene described the wounds by invoking "The Walking Dead," declaring that the skin was just falling off the bone. Trial Tr. at 475.

{¶ 10} Law enforcement officers descended on the scene, not realizing that Farra was still in the facility. Video surveillance footage showed that after Farra parked and exited the car, he climbed a nearby concrete retaining wall inside the building and hid for

hours while the investigation was being carried out.

{¶ 11} Deaton told Dayton Police Officer Stephen Quigney that his female abductor was the same woman he had had interactions with over the past few days named "Boomershine," and then gave her general physical descriptors. Officer Quigney was able to input that information into his MIS system, and he found a field identification card that linked Boomershine to Hollywood Casino. He then accessed her driver's license picture, which matched the description given by Deaton. Officer Quigney was also informed that Deaton's male abductor had an "S" shaped tattoo on the left side of his face. Officer Quigney then learned that there was a male associated with Boomershine with a large facial tattoo – Farra. Deaton also informed law enforcement that two shots had been fired that night: the first shot went through his pillow in his bedroom, and a second round was fired in the car while he was being driven around. He did not know the circumstances surrounding the second shot, though, because his head had been covered.

{¶ 12} Miamisburg Detective Jason Threlkeld soon arrived at the hospital and was informed by Officer Quigney about what happened and the potential suspects. He then spoke with Deaton and was struck by the severity of his injuries. "I immediately observed very [horrific] severe wounds on both of his arms and his hands, some on his neck [and] face[.]" Trial Tr. at 643. After getting the story from Deaton, Detective Threlkeld notified Miamisburg Detective Sergeant Jeff Muncy about the potential complexity of the investigation due to the multitude of crime scenes.

{¶ 13} Detective Muncy got other Miamisburg detectives involved and enlisted the

help of the Ohio Bureau of Criminal Investigations (BCI) and the Tactical Crime Suppression Unit (TCSU – a coalition of detectives from neighboring jurisdictions) for extra manpower. Teams were sent to Deaton's Wileray Avenue home in Miamisburg to collect evidence of the initial break-in and abduction, the Rumpke recycling facility where Deaton was left in the car, and Hollywood Casino in Dayton to collect video footage of Deaton and Boomershine from days earlier. Other crime scenes soon emerged.

{¶ 14} Jeffrey Yount, an Oakwood detective, and Centerville Detective Chad Eckenrode, both part of the TCSU task force, were sent to Hollywood Casino to obtain surveillance footage. While they were there, they received a call that a CSX Railroad employee had found items that could be related to their investigation. Det. Yount testified that the CSX facility was almost immediately next door to the casino, so he and Detective Eckenrode went there. When they arrived, the detectives learned that rail workers had found a "Dopp Kit" (toiletries bag) and a revolver in or near a dumpster next to the tracks. Inside the bag detectives found a Case knife (a brand of collectable knives), a wallet, a Xenia Municipal Court Probation Department business card from Carlos Walker that read: "Next Appointment Date: 1/22 at 2pm," and a post-it note with "Jessica" and a phone number. Inside the wallet were Deaton's identification card, his deceased wife's identification card, an Air Force service card, and credit cards belonging to Deaton.

{¶ 15} As the day of January 16 progressed, investigators got more leads. Detective Muncy called the number on the Xenia Municipal Court Probation Department card and spoke to Carlos Walker, a probation officer with the court. He confirmed that the 2 p.m. appointment on January 22 belonged to Farra, who had just gotten out of jail a day

earlier. That evening, Boomershine was located at Hollywood Casino by security staff and then arrested by officers. She was taken to the Miamisburg police headquarters and interviewed. At the time of her arrest, she had in her purse car keys belonging to Deaton, a syringe, and a document from Xenia Municipal Court with Farra's name on it. Investigators learned some important information from Boomershine: she admitted to being involved in the crime and implicated Farra as well. Boomershine also confirmed that the number on the "Jessica" post-it note found with Deaton's wallet was hers, but indicated that Farra had her phone. She then completed a "controlled call" to Farra to ascertain his whereabouts. The call was fruitful as it elicited incriminating information from Farra and gave them his location – his "papaw's house" on Drummer Avenue in Dayton.

{¶ 16} There was a large law enforcement response to the Drummer Avenue location. Miamisburg Detective Justin Small testified that when officers knocked, Farra's grandfather opened the door. When he backed out of the way, Farra could be seen sitting in a chair, just inside the door. He was ordered to the floor, handcuffed, and then brought outside without incident. It was soon discovered, however, that Farra had been shot in the leg, so he was transported to the hospital for treatment. Authorities found a Kyocera flip phone, Case knives, and a flashlight on his person. Detective Small packaged up those items along with the bloody pants Farra had been wearing.

{¶ 17} Once medical personnel were done treating his wounds, Farra expressed his desire to speak with Detectives Muncy and Threlkeld. During his interview, Farra admitted to being a part of the incident(s) with Deaton but insisted that Boomershine and "some black guys" had forced him to take part to pay off Boomershine's drug debt.

{¶ 18} On January 27, 2020, Farra was indicted by the Montgomery County Grand Jury on: Count 1 - aggravated burglary (physical harm); Count 2 - aggravated burglary (deadly weapon); Count 3 - aggravated robbery (deadly weapon); Count 4 - aggravated robbery (serious harm); Count 5 - kidnapping (felony or flight); Count 6 - kidnapping (terrorize/physical harm); Count 7 - felonious assault (serious harm); Count 8 -  felonious assault (deadly weapon); Count 9 - grand theft (firearm); Count 10 - grand theft (motor vehicle); Count 11 - misuse of credit cards (elderly/disabled person). Counts 1-8 and Count 10 contained attendant three-year gun specifications.

{¶ 19} Farra filed a motion for competency and sanity evaluations on February 18, 2020. He was examined by Dr. Scott Kidd who, in his report, determined to a reasonable degree of psychological certainty that Farra was competent and was ineligible for a not guilty by reason of insanity (NGRI) plea. As a result, the trial court found him competent to stand trial. On March 23, 2020, Farra filed a motion to suppress. After a hearing on May 1, 2020, the trial court overruled his motion.

{¶ 20} Finally, on October 19, 2020, the case progressed to a bench trial. Over the course of the three-day trial, the State presented 18 witnesses and 191 exhibits. Farra did not enter any exhibits or testify himself, and ultimately, the trial court found him guilty as charged.

{¶ 21} Both parties filed sentencing memoranda prior to the November 3, 2020 disposition. Prior to sentencing Farra, the trial court merged Counts 2, 9, and 10 with Count 1 (aggravated burglary - physical harm). Counts 4 and 11 were merged with Count 3 (aggravated robbery - deadly weapon), and Count 6 was merged with Count 5

(kidnapping). The felonious assault charges (Count 7 and Count 8) were not merged. The trial court also merged some of the gun specifications. Ultimately, Farra was sentenced to 11 to 16½ years for Count 1 (aggravated burglary), 11 years for Count 3 (aggravated robbery), 11 years for Count 5 (kidnapping), 8 years for Count 7 (felonious assault) and 8 years for Count 8 (felonious assault). The trial court ordered all the terms to be served consecutively. Farra was sentenced to an additional 6 years (to be served prior to the underlying convictions) on the gun specifications, was ordered to pay restitution, and was classified as a violent offender. All told, Farra was sentenced to 55 to 60½ years in prison.

{¶ 22} Farra appeals, raising 12 assignments of error.

## II.     Competency and sanity evaluations

{¶ 23} In his first assignment of error, Farra argues that the trial court failed to comply with R.C. 2945.371 and therefore denied his equal protection and due process rights. We note at the outset that this statute was amended on August 3, 2021, after this case's completion, so our analysis will use the version of the law in place at the time of the proceedings.

{¶ 24} If the issue of a defendant's competence to stand trial is raised, the trial court may order evaluations of the defendant's current mental condition, or in the case of a NGRI plea, the mental condition at the time of the offense. R.C. 2945.371(A). Once the evaluation(s) are completed, "[t]he examiner shall file a written report with the court thirty days after entry of a court order for evaluation, and the court shall provide copies of the report to the prosecutor and defense counsel." R.C. 2945.371(G). If the examiner appointed to evaluate the defendant's competence is also appointed to evaluate the

appropriateness of an NGRI plea, the examiner "shall prepare separate reports on the issue of competence to stand trial and the defense of not guilty by reason of insanity." R.C. 2945.371(I). At the competency hearing, the defendant "shall be represented by counsel," R.C. 2945.37(D), and either party "may submit evidence on the issue of the defendant's competence to stand trial. A written report of the evaluation of the defendant may be admitted into evidence at the hearing by stipulation." R.C. 2945.37(E).

{¶ 25} We review a trial court's decision regarding competency evaluations for an abuse of discretion. *State v. Curry*, 2d Dist. Greene No. 2012-CA-50, 2014-Ohio-3836, ¶ 40. To constitute an abuse of discretion, a trial court's action must be arbitrary, unreasonable, or unconscionable. *Ojalvo v. Bd. of Trustees of Ohio State Univ.*, 12 Ohio St.3d 230, 232, 466 N.E.2d 875 (1984). "A trial court's finding that a defendant is competent to stand trial will not be disturbed where there is some reliable and credible evidence supporting that finding." *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 33.

{¶ 26} In this case, Farra concedes that because there was no objection to the competency/NGRI evaluations at the trial court level, he has waived all but plain error on appeal. Plain error exists "if the trial outcome would clearly have been different, absent the alleged error in the trial court proceedings." *State v. Rollins*, 2d Dist. Clark No. 2005-CA-10, 2006-Ohio-5399, ¶ 15.

{¶ 27} Farra filed a motion for "mental competency evaluation of defendant and sanity examination" on February 18, 2020, and the following day, in two separate orders, the trial court ordered both evaluations. The evaluations were done by Dr. Scott Kidd, and

the trial court received the reports on March 13, 2020. Forensic Report Hearing Tr. at 2. On March 24, 2020, the formal competency hearing was held where the trial court summed up Dr. Kidd's findings: "Dr. Kidd has opined, to a reasonable degree of psychological certainty, that Mr. Farra is competent at the present time, and he is not eligible for a not guilty by reason of insanity plea." Forensic Report Hearing Tr. at 2. Both parties stipulated to the findings in the reports, and the trial court found Farra competent to stand trial.

{¶ 28} Nevertheless, Farra now argues that the trial court erred in making its competency finding because Dr. Kidd did not prepare separate reports on the issues of competency and NGRI. The record, however, belies that assertion. First, Farra concedes in his brief that there were two reports. "(1) **Both Report(s)** basically reflect a mirror image of each other; and (2) **Both Report(s)** were comprised of identical examinations which clearly reflect Appellant was suffering from substantial mental health * * * irregularities[.]" (Emphasis added.) Appellant's Brief at 8-9. The record also indicates that the trial court received and reviewed two separate reports. Forensic Report Hearing Tr. at 2 ("[T]he Court received forensic reviews for competence and for NGRI from Dr. Scott Kidd.").

{¶ 29} Farra also contends that the NGRI report "was never actually 'filed with the Court' as statutorily required[.]" Appellant's Brief at 8. On this point, Farra is right. While it is undisputed that both parties received, reviewed, and stipulated to the contents of the reports, and that the court received and reviewed them, no one ever filed Dr. Kidd's reports with the clerk of courts as required by the statute. While this is technically an error, it is not one that made any practical difference in the outcome of the proceedings, as all

parties had access to and stipulated to the reports.

{¶ 30} We find, therefore, that while the trial court erred by not filing the competency and NGRI reports with the clerk of courts as required by statute, the error does not rise to the level of plain error because the outcome of the trial would not have been different, and Farra has not expressed any issues with the contents of the reports themselves. The first assignment of error is overruled.

### III.    Suppression Issues

{¶ 31} In his second assignment of error, Farra avers that the trial court erred when it overruled his motion to suppress. While his brief is less than clear about the arguments he intends to make on the topic, the State has discerned three arguments that we will address: (1) Farra did not knowingly, intelligently, and voluntarily waive his *Miranda* rights; (2) his statements were taken under circumstances that violated his Fourth Amendment right to be free from unlawful searches and seizures; and (3) the "ping" technology used to help locate him constituted a violation of his Fourth Amendment rights.

{¶ 32} An appeal from a ruling on a motion to suppress presents a mixed question of facts and law. *State v. Ojezua*, 2016-Ohio-2659, 50 N.E.3d 14, ¶ 15 (2d Dist.). When considering a motion to suppress, the trial court takes on the role of trier of fact and is in the best position to resolve factual questions and assess the credibility of witnesses. *State v. Turner*, 2015-Ohio-4612, 48 N.E.3d 981, ¶ 10 (2d Dist.). As a result, we must accept the trial court's findings of fact if they are supported by competent and credible evidence. *Id.* "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the

applicable legal standard." *Id.*, quoting *State v. Koon*, 2d Dist. Montgomery No. 26296, 2015-Ohio-1326, ¶ 13. The trial court's application of law to the findings of fact is subject to a de novo standard of review. *Id.*

### *Miranda* Issues

{¶ 33} Under the Fifth Amendment to the United States Constitution, no person shall be compelled to be a witness against himself. To ensure that this right is protected, statements resulting from custodial interrogations are only admissible after showing that the procedural safeguards described in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), have been followed. *State v. Earnest*, 2d Dist. Montgomery No. 26646, 2015-Ohio-3913, ¶ 21. Prior to questioning, a suspect "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney." *In re M.H.*, 163 Ohio St.3d 93, 2020-Ohio-5485, 168 N.E.3d 439, ¶ 18, quoting *Miranda* at 444.

{¶ 34} An individual may waive his *Miranda* rights only if the waiver is made knowingly, intelligently, and voluntarily. *Miranda* at 444. To be voluntary, a waiver of *Miranda* rights need not be the product of a free will, it simply means that the suspect's decision was free from official coercion. *Colorado v. Connelly*, 479 U.S. 157, 107 S. Ct. 515, 93 L.Ed.2d 473 (1986). The validity of the waiver will be based on the totality of the circumstances including the age, mentality, prior criminal experience of the accused, the length, intensity, and frequency of interrogation, as well as the conditions surrounding the interrogation. *State v. Hetzel*, 2d Dist. Montgomery No. 14411, 1996 WL 391730, *3 (July 12, 1996), citing *State v. Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976). "What is

essential is that the defendant have a full awareness of the nature of the constitutional rights being abandoned and the consequences of his decision to abandon them. * * * The question is not one of form, but whether defendant in fact knowingly and voluntarily waived his rights." *State v. Monticue*, 2d Dist. Miami No. 2006-CA-33, 2007-Ohio-4615, ¶ 10.

{¶ 35} Waiver can be inferred where a defendant speaks to officers after being advised of his rights and indicating that he understands them. *State v. Dillon*, 2016-Ohio-1561, 63 N.E.3d 712, ¶ 59. *See Berghuis v. Thompkins*, 560 U.S. 370, 388-389, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010) ("[A] suspect who has received and understood the *Miranda* warnings, and has not invoked his *Miranda* rights, waives the right to remain silent by making an uncoerced statement to police."). This is even true if the suspect refuses to sign a waiver form. *Dillon* at ¶ 59. "Where a suspect speaks freely to police after acknowledging that he understands his rights, a court may infer that the suspect implicitly waived his rights." *State v. Murphy*, 91 Ohio St.3d 516, 519, 2001-Ohio-112, 747 N.E.2d 765.

{¶ 36} Here, both parties agree that at the time of his interview at the hospital with Detectives Muncy and Threlkeld, Farra was under arrest (in custody) and thus was required to be informed of his *Miranda* rights before answering questions. The record is very clear that Farra's *Miranda* rights were explained, and that he voluntarily waived them.

{¶ 37} According to the audio recording of Farra's hospital interview and suppression hearing testimony, Farra confirmed from the very beginning that he wanted to speak with the detectives, and according to testimony from Detective Muncy, Farra

even stated that he already knew his rights. Nevertheless, the *Miranda* rights were read from the card provided by the Montgomery County Prosecutor's Office, and Farra indicated he understood each right, responding with "yes, sir" when asked for comprehension. He reaffirmed throughout the cordial 30-minute interview that he wanted to keep talking and never asked for an attorney. Further, Detective Muncy testified that Farra's responses were coherent and appropriate and that Farra specifically stated he was not under the influence of drugs or alcohol.

{¶ 38} Farra also argues his waiver was invalid because he was under the influence of drugs or suffering from severe mental illness and intellectual disability at the time of his hospital interview. Again, there is no evidence in the record to support that assertion. First, as to the claim that Farra was under the influence of drugs during the interview, his own words undermine that contention. On the recording, Farra explicitly denied being under the influence of drugs or alcohol and told the detectives that he was not even on any hospital-provided medication. As to the claim that he was suffering from severe mental illness and intellectual disability, there is simply nothing in the record to back that up.

{¶ 39} Based on the record before us, we conclude that Farra knowingly, intelligently, and voluntarily waived his *Miranda* rights.

Seizure

{¶ 40} Farra also argues that "the statements obtained from said interview(s) were taken under circumstances which violated his Fourth Amendment right to be free from unlawful searches and seizures." Appellant's Brief at 11. While his brief gives no further

explanation as to why he believes this, it can be inferred that Farra is making the same argument he did in his suppression motion – that he was unlawfully seized. We disagree.

**{¶ 41}** The Fourth Amendment of the United States Constitution and Article I, Section 14 of the Ohio Constitution protect individuals from unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *State v. Pressley*, 2d Dist. Montgomery No. 24852, 2012-Ohio-4083, ¶ 18.

**{¶ 42}** A person has been seized for the purposes of the Fourth Amendment when a law enforcement officer, by means of physical force or show of authority, has in some way restrained his or her freedom such that a reasonable person would not feel free to walk away. *United States v. Mendenhall*, 446 U.S. 544, 553, 100 S.Ct.1870, 64 L.Ed.2d 497 (1980). *See also State v. Retherford*, 93 Ohio App.3d 586, 595, 639 N.E.2d 498 (2d Dist.1994).

**{¶ 43}** "An arrest warrant is issued by a magistrate upon a showing that probable cause exists to believe that the subject of the warrant has committed an offense and thus the warrant primarily serves to protect an individual from unreasonable seizure." *Steagald v. United States*, 451 U.S. 204, 213, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981). *See also State v. Gardner*, 135 Ohio St.3d 99, 2012-Ohio-5683, 984 N.E.2d 1025, ¶ 22 (a suspect "subject to an arrest warrant does not enjoy the full panoply of privacy rights that other individuals enjoy.").

**{¶ 44}** In this case, a valid arrest warrant was signed in Miamisburg Municipal Court at 2:32 p.m. on January 16, 2020; there was probable cause to believe that Farra had committed community control violations due to his alleged failure to report to his

probation officer and convictions in two local municipal courts. Detective Muncy and other officers were aware of the warrant when Farra was arrested at this grandfather's house on Drummer Avenue that evening, and the fact that it was signed only hours earlier does not diminish the warrant's efficacy. Contrary to Farra's stance, the statements he made after his arrest were not inadmissible.

Phone "Pings"

{¶ 45} Finally, Farra asserts that the "efforts utilized by the detectives to determine his whereabouts utilizing 'Ping' technology constituted additional violations of [his] rights under the Fourth Amendment." Appellant's Brief at 11. This argument, however, was not raised in the trial court, and accordingly, it cannot be raised for the first time here on appeal, making it subject to plain error review. Farra, though, does not set forth a plain error argument other than to generally conclude that detectives' determination of his whereabouts using "ping" technology violated his rights. Not only is that blanket statement an insufficient plain error argument, but it is also factually incorrect. The record indicates that the efforts to locate Farra by way of phone "pings" were unsuccessful, and it was not until Boomershine conducted a "controlled call" with him that investigators discerned his location; it was during that call that Farra revealed he was staying at his grandfather's house on Drummer Avenue in Dayton.

{¶ 46} Further still, Farra lacks constitutional standing to challenge the validity of the "pings" because the phone was not his but rather Boomershine's. "Fourth Amendment rights are personal rights which * * * may not be vicariously asserted." *Rakas v. Illinois*, 439 U.S. 128, 134, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). A person who is aggrieved only

through the introduction of damaging evidence secured through a search of a third person's property has not had any of his Fourth Amendment rights infringed. *Id*; *State v. Snowden*, 2019-Ohio-3006, 140 N.E.3d 1112, ¶ 102 (2d Dist.); *United States v. Baker*, M.D. PA No. 3:19-32, 2021 WL 4317995 (Sept. 23, 2021) (no standing to challenge cell phone location data where "pings" tracked co-defendant's phone). So here, Farra cannot complain about the State's "pinging" the cell phone that he possessed because it belonged to Boomershine; he lacks standing to challenge that governmental action.

{¶ 47} The trial court did not err in overruling Farra's motion to suppress, and as a result, his second assignment of error is overruled.

### IV. Identification

{¶ 48} Identification is at the heart of Farra's third and fourth assignments of error. His third assignment argues that the trial court erred in failing to recognize defects in Deaton's identification efforts, and in his fourth, he asserts that because the identification was insufficient, the convictions were based on insufficient evidence and were against the manifest weight of the evidence. We will address these arguments together.

{¶ 49} A sufficiency of the evidence argument disputes whether the prosecution has presented adequate evidence on each element of the offense to permit the case to go to the jury or to sustain the verdict as a matter of law. *State v. Brock*, 2019-Ohio-3116, 140 N.E.3d 1239, ¶ 16 (2d Dist.). Our role when reviewing the sufficiency of the evidence to support a conviction is to "examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991),

paragraph two of the syllabus.

{¶ 50} When an appellate court reviews whether a conviction is against the manifest weight of the evidence, "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A case should not be reversed as being against the manifest weight of the evidence except "in the exceptional case in which the evidence weighs *heavily* against the conviction." (Emphasis added.) *Id.* "When engaged in this limited reweighing, the appellate court may not merely substitute its view for that of the trier of fact[.]" *State v. Thompson*, 10th Dist. Franklin No. 16AP-812, 2017-Ohio-8375, ¶ 25.

{¶ 51} "Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." (Citations omitted.) *State v. McCrary*, 10th Dist. Franklin No. 10AP-881, 2011-Ohio-3161, ¶ 11. *Accord State v. Winbush*, 2017-Ohio-696, 85 N.E.3d 501, ¶ 58 (2d Dist.). As a result, "a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." (Citations omitted.) *State v. Braxton*, 10th Dist. Franklin No. 04AP-725, 2005-Ohio-2198, ¶ 15.

{¶ 52} In his brief, Farra makes no manifest weight or sufficiency arguments other

than to challenge his identification; we, thus, focus our analysis on that issue. "Every criminal prosecution requires proof that the person accused of the crime is the person who committed the crime. This truism is reflected in the state's constitutional burden to prove the guilt of 'the accused' beyond a reasonable doubt. Like any fact, the state can prove the identity of the accused by 'circumstantial or direct' evidence." (Citations omitted.) *State v. Tate*, 140 Ohio St.3d 442, 2014-Ohio-3667, 19 N.E.3d 888, ¶ 15.

{¶ 53} While it is true that there was not a positive identification of Farra as the perpetrator by the victim (and in fact, Deaton failed to pick Farra out of a photo lineup), nevertheless there was a substantial amount of circumstantial evidence that implicated him. Deaton told officers that there were two perpetrators involved in his ordeal: Boomershine, whom he knew, and an unknown male with a S-shaped tattoo on the side of his face. Already knowing the identity of Boomershine and having the unique descriptor of an S-shaped face tattoo for her partner, detectives were able to quickly identify Farra, who was a known associate of hers. Once that initial connection was made, the evidence began to pile up.

{¶ 54} At her arrest, Boomershine was carrying a purse which contained several items related to the crimes, including a document from Xenia Municipal Court with Farra's name on it. State's Exhibit 46. She was interviewed by detectives and implicated Farra as her co-conspirator and then agreed to make a "controlled call" to her phone, which she knew was in Farra's possession. Not only did he answer the phone when she called, but Farra made inculpatory statements during the several minutes-long conversation.

{¶ 55} There was also evidence discovered at the CSX railyard that helped identify

Farra as the suspect. Some of items in the "Dopp Kit" found at that location were Deaton's wallet, his revolver with two spent rounds (Deaton testified that the gun went off twice during his ordeal), a Case Knife (which he was known to collect), and a Xenia Municipal Court Probation Card with "Next appointment date: 1/22 at 2pm" written on it. Carlos Walker (the probation officer listed on the card) confirmed that Farra was scheduled for an appointment at that time. In addition, Farra's DNA was found on the "Dopp Kit" containing those items.

**{¶ 56}** There was also significant evidence from the Rumpke facility that linked Farra to the crimes. In surveillance video from the night in question, Farra is seen climbing up a post and onto a structural beam, and then later he is seen climbing a cement retaining wall and then hiding there before eventually exiting the building. In addition to the video evidence, Farra's DNA was found in multiple locations at the facility, including on the post and concrete wall that he climbed.

**{¶ 57}** Finally, there was evidence of Farra's involvement found on his person when he was arrested. In the search incident to arrest, officers found a Case knife and Deaton's flip phone in Farra's pants pockets (he was wearing jeans and sweatpants at the time of arrest). Forensic testing then showed Deaton's DNA on both Farra's jeans and sweatpants.

**{¶ 58}** Based on the evidence presented at trial, Farra's identity was established; his convictions were based on sufficient evidence and were not against the manifest weight of the evidence. His third and fourth assignments of error are overruled.

**V.    Merger**

{¶ 59} Farra, in his fifth assignment of error, asserts that the trial court erred by failing to merge allied offenses of similar import. It appears his argument is that all the counts for which he was sentenced for should have merged.

{¶ 60} When a defendant's behavior supports multiple offenses, courts conduct an allied offenses analysis to determine if the charges merge or if the defendant may be convicted of separate crimes. This process is governed by statute, R.C. 2941.25, and Ohio Supreme Court jurisprudence from *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892. R.C. 2941.25 provides:

(A) Where the same conduct by [a] defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 61} "As a practical matter, when determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions when the defendant's conduct supports multiple offenses: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation? An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import

must all be considered." *Ruff* at ¶ 31; *State v. Davison*, 2d Dist. Montgomery No. 28579, 2021-Ohio-728, ¶ 29. Offenses are of dissimilar import "when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Ruff* at ¶ 23.

**{¶ 62}** A defendant bears the burden of establishing that offenses should be merged as allied offenses, and we review the trial court's merger ruling de novo. *State v. Frazier,* 2d Dist. Clark No. 2021-CA-46, 2021-Ohio-4155, ¶ 20.   The failure to raise the issue of merger in the trial court forfeits all but plain error, and the error is not reversible unless it affects the outcome of the proceeding and reversal is necessary to correct a manifest injustice. *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22.

**{¶ 63}** In his brief, Farra claims that the aggravated burglary, aggravated robbery, felonious assault, and kidnapping charges "all correspond to a similar animus" – he wanted to take Deaton's property. Appellant's Brief at 13. We find this argument unpersuasive, however, because even if his motivation to commit the crimes was the same, the charges would not merge under *Ruff* because they were committed separately.

**{¶ 64}** When considering whether offenses were committed separately, we have said that if "one offense was complete before the other offense occurred, the two offenses were committed separately for purposes of R.C. 2941.25(B), notwithstanding their proximity in time and that one was committed in order to commit the other." *State v. Turner*, 2d Dist. Montgomery No. 24421, 2011-Ohio-6714, ¶ 24. When one crime is completed prior to the completion of another during the defendant's course of conduct,

"those offenses are separate acts." *State v. Mooty*, 2014-Ohio-733, 9 N.E.3d 443, ¶ 49 (2d Dist.). In this case, the charges Farra was sentenced on happened separately at distinct moments in time during the ordeal.

### Count 1: Aggravated Burglary (physical harm)

**{¶ 65}** According to R.C. 2911.11(A)(1), a person is guilty of aggravated burglary (physical harm) if by force, stealth, or deception, he trespasses in an occupied structure when another person is present with the purpose to commit in the structure any criminal offense and the offender inflicts or attempts or threatens to inflict physical harm on another. This crime was completed when Farra entered Deaton's house by breaking a back window and then threatened to shoot Deaton if he did not comply. Farra then fired the gun into Deaton's pillow, inches from his head.

### Count 3: Aggravated Robbery (deadly weapon)

**{¶ 66}** Aggravated robbery (deadly weapon) is completed when a person, in attempting or committing a theft offense, has a deadly weapon on his or her person, displays it, brandishes it, indicates he or she possesses it, or uses it. R.C. 2911.01(A)(1). In this case, Farra committed the crime of aggravated robbery when he put a gun to Deaton's head while in the car to demand that Deaton give him the correct PIN number for his bank account.

### Count 7: Felonious Assault (serious physical harm)

**{¶ 67}** A person commits felonious assault (serious physical harm) when he or she knowingly causes serious physical harm to another. R.C. 2903.11(A)(1). This felonious assault occurred while Farra and Deaton struggled for the gun in the back of the car. As

a result of the altercation, Farr caused serious and gruesome injuries to Deaton's arms that required hospitalization and skin grafts.

Count 8: Felonious Assault (deadly weapon)

**{¶ 68}** Felonious assault (deadly weapon) is committed when a person knowingly causes or attempts to cause physical harm to another by means of a deadly weapon. R.C. 2903.11(A)(2). This crime occurred while the parties were still at Deaton's home when Farra struck Deaton in the head and neck area with a gun, causing severe bruising to Deaton's head.

Count 5: Kidnapping (felony or flight)

**{¶ 69}** Kidnapping (felony or flight) is committed when an assailant, by force, threat, or deception removes another from the place where the other person is found or restrains the other person's liberty to facilitate the commission of any felony or flight thereafter. R.C. 2905.01(A)(2). Here, Deaton was kidnapped when he was removed from his bed and house, and the crime continued while he was driven around in his car, both on the floorboard of the backseat and then the trunk. It arguably ended when he escaped from the trunk while inside the Rumpke facility. During the kidnapping, other crimes took place, so at first glance it may appear that these should merge; however, a review of the caselaw points to the opposite conclusion.

**{¶ 70}** Kidnapping and other crimes are not always allied offenses subject to merger because they can involve distinct acts; even when they involve the same conduct, the crimes can have a separate animus. *State v. Grable*, 2d Dist. Clark No. 2014-CA-52, 2015-Ohio-788, ¶ 13 (March 6, 2015). "A separate animus for kidnapping exists where

(1) 'the restraint is prolonged, the confinement is secretive, or the movement is so substantial as to demonstrate a significance independent of the other offense,' or (2) 'the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime.' " *State v. Johnson*, 2d Dist. Montgomery No. 26323, 2015-Ohio-347, ¶ 14, citing *State v. Logan,* 60 Ohio St.2d 126, 397 N.E.2d 1345 (1975), syllabus. In this case, Deaton was driven for hours against his will, stuffed in the trunk, and then left at the Rumpke facility. Farra could have let Deaton out after his money was withdrawn, but instead chose to keep him bound. After all the other crimes were completed, the kidnapping continued, making it separate and distinct from the other crimes. Because of Deaton's injuries and age, it also substantially increased the risk of harm.

{¶ 71} After considering the crimes Farra suggests should have been merged, we conclude that all of them were committed separately, and thus the trial court was correct in determining that they should not be merged under *Ruff*. Farra's fifth assignment of error is overruled.

## VI. Sentences

{¶ 72} In Farra's sixth, seventh, eighth, and ninth assignments of error, he challenges the lawfulness of his sentences. In his sixth assignment of error, Farra claims that the trial court erred because it did not comply with the purposes and principles of sentencing found in R.C. 2929.11. In the seventh and eighth, he argues that his sentence is not clearly and convincingly supported by the record and that it is not supported by competent, credible evidence. Finally, in Farra's ninth assignment of error, he avers that

the court did not make the requisite consecutive sentence findings. Because these are related topics, we will consider them together.

**{¶ 73}** When reviewing felony sentences, a court of appeals must apply the standard of review set forth in R.C. 2953.08(G). Under that statute, an appellate court may increase, reduce, or modify a sentence, or vacate it altogether and remand for resentencing, if it "clearly and convincingly finds either (1) the record does not support certain specified findings or (2) that the sentence imposed is contrary to law." *State v. Worthen*, 2d Dist. Montgomery No. 29043, 2021-Ohio-2788, ¶ 13.

**{¶ 74}** According to the Ohio Supreme Court, we may not independently "weigh the evidence in the record and substitute [our] judgment for that of the trial court concerning the sentence that best reflects compliance with R.C. 2929.11 and 2929.12." *State v. Jones*, 163 Ohio St.3d 242, 2020-Ohio-6729, 169 N.E.3d 649, ¶ 42. The inquiry is simply whether the sentence is contrary to law. A sentence is contrary to law when it falls outside the statutory range for the offense or if the sentencing court does not consider R.C. 2929.11 and 2929.12. *State v. Dorsey*, 2d Dist. Montgomery No. 28747, 2021-Ohio-76, ¶ 18.

**{¶ 75}** A trial court "has full discretion to impose any sentence within the authorized statutory range, and the court is not required to make any findings or give its reasons for imposing maximum or more than minimum sentences." *State v. King*, 2013-Ohio-2021, 992 N.E.2d 491, ¶ 45 (2d Dist.). And while there is a presumption in favor of concurrent sentences (*see* R.C. 2929.41(A)), pursuant to R.C. 2929.14(C), a trial court may impose consecutive sentences if it finds that (1) consecutive service is necessary to protect the

public from future crime or punish the offender; (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; and (3) one or more of the following findings are made:

(a) The offender committed the offenses while awaiting trial or sentencing, was under a sanction imposed pursuant to R.C. 2929.16, R.C. 2929.17, R.C. 2929.18, or was under post-release control.

(b) At least two of the offenses were committed as part of one or more courses of conduct, and the harm was so great that no single prison term adequately reflects the seriousness of the conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

*State v. Brewer*, 2017-Ohio-119, 80 N.E.2d 1257, ¶ 9 (2d Dist.), citing R.C. 2929.14(C)(4).

**{¶ 76}** At the disposition on November 3, 2020, the trial court heard oral statements from Farra, his counsel, the State, and two statements read by the Montgomery County Prosecutor's Office Victim Witness Division on behalf of Deaton's family. The court also stated that it had considered the sentencing memoranda presented by both parties, written victim impact statements, and the presentence investigation (PSI). The court then merged the appropriate counts, stated that it had considered the purposes and principles of sentencing and the seriousness and recidivism factors of R.C. 2929.11 and 2929.12 (Trial Tr. at 805-806), and imposed a sentence of 11 to 16½ years for Count 1 – aggravated burglary; 11 years for Count 3 – aggravated robbery; 11 years for Count 5 – kidnapping; 8 years for Count 7 – felonious assault; and 8 years for Count 8 – felonious

assault. An additional, consecutive six years of prison from firearm specifications was ordered as well, although Farra has not taken issue with the specifications.

**{¶ 77}** Farra argues that the court erred because it did not consider the rehabilitation component of R.C. 2929.11 when it crafted his sentence. That argument is unavailing because there is no evidence in the record to support that claim; to the contrary, the trial court explicitly stated that it had considered the principles and purposes of sentencing. Trial Tr. at 805-806. In addition to considering the principles and purposes of sentencing and the seriousness and recidivism factors, Farra's sentences were within the statutory ranges provided by the legislature. According to *Jones*, 163 Ohio St.3d 242, 2020-Ohio-6729, 169 N.E.3d 649, our analysis ends there, because R.C. 2953.08(G)(2)(b) does not provide a mechanism for an appellate court to modify or vacate a sentence based on finding that the sentence is "contrary to law" because it is not supported by the record under R.C. 2929.11 and 2929.12. "We simply must determine whether those sentences are contrary to law." *Dorsey* at ¶ 9. Because the sentences were within the statutory ranges and the court considered R.C. 2929.11 and 2929.12, we conclude that Farra's sentences were not contrary to law.

**{¶ 78}** Farra's consecutive sentences were proper as well. As required, the trial court determined that:

[C]onsecutive service is necessary to protect the public from future crime or to punish the offender, that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger that he poses to the public; at least two of the multiple offenses were committed as part of

one or more courses of conduct; and the harm caused was [so] great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct; and his history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

Trial Tr. at 808-803.

**{¶ 79}** The record before us supports the maximum consecutive sentences and the court's finding that they were necessary. Putting aside the heartless and rough treatment of the elderly victim in this case, which would, by itself, likely merit long, consecutive sentences, the record indicates a persistent history of violence from Farra. The PSI established that within a 24-hour period as a juvenile in Kentucky, Farra had murdered two people in incidents that were eerily similar to the case at bar. Both murders involved breaking into the homes of older victims, robbing them, beating them, ransacking the houses for valuables, and then leaving them for dead. After being sentenced as a juvenile for the murders, Farra escaped the juvenile facility and fled to Mississippi where he lived, unaccounted for, for three years until he was arrested again, this time for assaulting a police officer. He was sentenced to 12 years on the escape charge, and when he was released from prison in 2018, he moved to Ohio where he picked up additional convictions, both felony and misdemeanor. In fact, he committed the crimes in this case within hours of being released from the Greene County Jail.

**{¶ 80}** Because Farra's individual sentences were within the statutory ranges and

because the court considered the principles and purposes of sentencing and the seriousness and recidivism factors, we cannot say that the sentences were contrary to law. Similarly, because the court made the requisite consecutive sentence findings, which were supported by the record, we conclude it did not err by ordering consecutive sentences. Farra's sixth, seventh, eighth, and ninth assignments of error are overruled.

## VII. Consistency in sentencing

{¶ 81} In his tenth assignment of error, Farra contends that the trial court erred in levying a sentence that was not consistent with sentencing imposed for similar crimes committed by similar offenders. He makes no effort, however, to expand on the idea outside of a block quote of R.C. 2929.11. "According to App.R. 12(A)(2), when a party 'fails to identify in the record the error on which the assignment of error is based or fails to argue the assignment separately in the brief,' an appeals court may disregard that assignment of error." *Martcheva v. Dayton Bd. of Edn.*, 2021-Ohio-3524, 179 N.E.3d 687, ¶ 22 (2d Dist.). Further, under App.R. 16(A)(7), an appellant's brief must contain the arguments and reasons in support of the contentions, "with citations to the authorities, statutes, and parts of the record on which appellant relies." *Id.* "The burden of affirmatively demonstrating error on appeal rests solely with the appealing party. * * * It is not the duty of this court to search the record for evidence to support an appellant's argument as to alleged error." *Id.*, quoting *Shumate v. Gahanna*, 10th Dist. Franklin No. 02AP-881, 2003-Ohio-1329, ¶ 6. Because Farra has not explained how or why the trial court allegedly erred, his tenth assignment of error is overruled.

## VIII. Cruel and Unusual Punishment

{¶ 82} The eleventh assignment of error asserts that Farra's 55 to 60½ year sentence was cruel and unusual because it constituted a life sentence.

{¶ 83} The Eighth Amendment to the United States Constitution states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." In addition to protecting individuals from punishments like torture, the Eighth Amendment has been invoked to outlaw punishments that are disproportionate to the crime committed. *State v. Ford*, 2d Dist. Clark No. 2019-CA-85, 2020-Ohio-5273, ¶ 19.

{¶ 84} "As a general rule, a sentence that falls within the terms of a valid statute cannot amount to a cruel and unusual punishment." *McDougle v. Maxwell*, 1 Ohio St.2d 68, 69, 203 N.E.2d 334 (1964). It is well settled that a sentence does not violate the Eighth Amendment unless it is so grossly disproportionate to the crime that it "shocks the sense of justice in the community." *State v. Chaffin*, 30 Ohio St. 2d 13, 282 N.E.2d 46 (1972), syllabus.

{¶ 85} In this case, the record reflects that Farra's punishment did not amount to cruel and unusual punishment, despite its lengthy term. Initially, all Farra's sentences (a minimum of 11 years for Count 1 – aggravated burglary; 11 years for Count 3 – aggravated robbery; 11 years for Count 5 – kidnapping; 8 years for Count 7 – felonious assault; and 8 years for Count 8 – felonious assault) were within the statutory ranges, albeit at the top. According to the well-settled case law from *McDougle* and its progeny, Farra's sentences, because they were within the statutory limits, did not amount to cruel and unusual punishment.

{¶ 86} Further still, those sentences, even though they amounted to more than five decades of imprisonment, did not shock the sense of justice in the community as being disproportionate to the crimes committed. Farra woke up the 85-year-old Deaton by placing a gun to his head and then firing a shot into his pillow only inches away. He then ransacked the house looking for (presumably) money, and when he did not find what he was looking for, he bound Deaton, placed a hood over his head and threw him into the back of his car. Farra, again at gunpoint, forced Deaton to give him the PIN for his bank account so Boomershine could withdraw money. Then, after Deaton decided to fight back, Farra injured his victim's arms so badly that the skin was "falling off the bone." Finally, after Deaton was gagged and stuffed in the trunk, Farra drove the car to the Rumpke facility, where he fled and left Deaton for dead. Considering the seriousness and brutality of the crimes, the age of the victim, and Farra's history, his sentences were not unconstitutional, despite their length. The eleventh assignment of error is overruled.

## IX.    Cumulative Error

{¶ 87} In his twelfth and final assignment of error, Farra argues that the doctrine of cumulative error should apply, and his convictions should be reversed.

{¶ 88} The cumulative error doctrine states that a conviction will be reversed where "the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995). This doctrine, however, only applies where there are "multiple instances of harmless error." *Id.* To find cumulative error we must find: (1) that multiple errors were

committed at trial, and (2) there is a reasonable probability that but for the multiple errors, the outcome of the trial would have been different. *State v. Goldblum*, 2d Dist. Montgomery No. 25851, 2014-Ohio-5068, ¶ 58.

**{¶ 89}** After carefully reviewing the record and considering the arguments in Farra's brief, we have found only one error on the part of the trial court, and it was a minor one. We certainly do not find a series of errors that would have changed the outcome of the case. The cumulative error doctrine does not apply, and Farra's twelfth assignment of error is overruled.

## X. Conclusion

**{¶ 90}** The judgment of the trial court will be affirmed.

. . . . . . . . . . . . .


DONOVAN, J. and WELBAUM, J., concur.


Copies sent to:

Mathias H. Heck, Jr.
Lisa M. Light
Carlo C. McGinnis
Hon. Mary L. Wiseman