[Cite as *State v. Harris*, 2024-Ohio-3329.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 29903 |
| | : | |
| v. | : | Trial Court Case No. 2021 CR 03806 |
| | : | |
| HENRY LAMAR HARRIS | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on August 30, 2024

. . . . . . . . . . .

JOHNNA M. SHIA, Attorney for Appellant

MATHIAS H. HECK, JR., by SARAH H. CHANEY, Attorney for Appellee

. . . . . . . . . . . .

TUCKER, J.

{¶ 1} Defendant-appellant Henry Lamar Harris appeals from his convictions for murder, felonious assault, discharge of a weapon on or near prohibited premises, and having weapons under disability. For the following reasons, we affirm.

## I. Factual and Procedural Background

{¶ 2} On June 13, 2021, P.B. was driving a white SUV; his brother L.B. was in the front passenger seat, and his nephew, L.B.'s son, was in the rear passenger seat. P.B. had driven the vehicle to the home of Joel Oldham, who ran a car wash out of his residence on Wentworth Avenue in Dayton. As P.B. was backing out of Oldham's driveway, a man approached the vehicle; when P.B. stopped the vehicle to shift from reverse to drive, the man fired numerous shots into the vehicle. P.B. was struck in the wrist and L.B. was struck multiple times. L.B. later died from his injuries.

{¶ 3} LaVon Robinson was at Oldham's home at the time of the shooting. He observed a black man walk a bicycle onto Oldham's porch. The man used some type of tool on the bike. Robinson was looking down when he heard about five or six pops which he thought sounded like firecrackers. He then saw the white SUV drive away, and he saw the man with the bicycle run away on foot without the bike.

{¶ 4} Larry Crutcher was sitting on his porch on Wentworth Avenue at the time of the shooting. Crutcher, who knew Harris by sight but not by name, observed Harris walking with a bicycle. Harris stopped in front of Crutcher's home and looked toward Oldham's residence. According to Crutcher, as a white SUV began backing out of Oldham's driveway, he saw Harris pull out a gun, walk toward the SUV, and fire into the driver's side of the vehicle. Harris then ran away and left the bike in front of Crutcher's home.

{¶ 5} Crutcher's son, Je'an Crutcher, had known Harris for years but only knew him by his nickname "Blakk." Je'an saw Harris walk up the street with a bike and stop in

front of the Crutchers' home. Je'an then saw Harris walk toward Oldham's house. Je'an then went inside his home, at which time he heard five gunshots.

{¶ 6} Je'an met with Dayton Police Department Detective David House and showed House Blakk's Facebook account. House gathered information about Harris from the Facebook account and through law enforcement websites. House then showed Je'an a picture of Harris from a law enforcement website. Je'an confirmed that Harris was the person he knew as Blakk.

{¶ 7} After receiving information that Harris had been spotted at a Greyhound Bus station in Columbus, U.S. Deputy Marshal David Youngless led other law enforcement officers to the station. They encountered Harris, who was carrying a backpack. Youngless had copies of two warrants for Harris's arrest. Harris refused to provide his name when asked and stated that he was not the person the officers were looking to arrest. Youngless took Harris into custody and conducted a search of the backpack. The backpack contained a handgun loaded with six bullets, two bags of bullets, and a bus ticket under a different name.

{¶ 8} A hammer found on Oldham's porch was swabbed for comparison with Harris's DNA and was found to be a match. The bullets removed from L.B.'s body were determined to have been fired from Harris's revolver. Harris's cellular telephone records indicated that he had been in the area of Wentworth Avenue at the time of the shooting. Je'an testified at trial that the gun located in Harris's backpack was the same gun he had previously observed in Harris's possession. A photographic array was presented to P.B., and he identified Harris as the shooter.

{¶ **9**} In January 2022, Harris was indicted on two counts of murder, five counts of felonious assault, one count of discharge of a weapon on or near prohibited premises, and two counts of having weapons under disability. Except the counts of having weapons under disability, all the counts carried attendant three-year firearm specifications. Harris filed motions to suppress the photographic identifications and the search of his backpack, both of which were overruled.

{¶ **10**} Harris was found guilty by a jury of the charges of murder, felonious assault, and discharge of a weapon on or near prohibited premises. The charges of having weapons under disability were tried to the judge, and Harris was also found guilty of those charges.

{¶ **11**} The trial court merged the murder convictions and the two counts of felonious assault related to L.B. and imposed a prison sentence of 15 years to life, plus a consecutive three-year sentence for a firearm specification. The trial court also merged the felonious assaults related to P.B. and sentenced Harris to an 8-years prison term on that offense, plus a consecutive three-year term for a firearm specification. The court ordered those two sentences to be served consecutively. The sentences imposed for the remaining offenses were ordered to be served concurrently with the sentence for murder. Thus, Harris's aggregate sentence was 29 years to life.

{¶ **12**} Harris appeals.

## II. Suppression Motion

{¶ **13**} The first assignment of error states as follows:

THE TRIAL COURT ERRED WHEN IT OVERRULED HARRIS'
MOTIONS TO SUPPRESS.

**{¶ 14}** Harris claims the trial court should have granted his motions to suppress pretrial identifications and the post-arrest search of his backpack.

**{¶ 15}** "Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." (Citation omitted.) *State v. Burnside*, 2003-Ohio-5372, ¶ 8. "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence . . . Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." (Citations omitted.) *Id.*

**{¶ 16}** We begin with Harris's claim that the trial court should have suppressed the warrantless search of his backpack.

**{¶ 17}** In general, warrantless searches are per se unreasonable, subject to only a few specific well-established exceptions. *State v. Leak*, 2016-Ohio-154, ¶ 15. "One such exception is for searches incident to a lawful arrest." (Citation omitted.) *State v. Frazee,* 2015-Ohio-4786, ¶ 10 (2d Dist.). This exception "derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations." (Citations omitted.) *Id.* Under this exception, "an officer making a lawful arrest may conduct a warrantless search of the arrestee's person and of the area 'within his

immediate control.' " *Id.* "The area within a person's immediate control includes 'the area from within which he might gain possession of a weapon or destructible evidence.' " *Id.* at ¶ 11. "The right to search incident to arrest exists even if the item is no longer accessible to the arrestee at the time of the search. . . . As long as the arrestee has the item within his immediate control near the time of the arrest, the item can be searched." (Citations omitted.) *State v. Adams*, 2015-Ohio-3954, ¶ 183.

{¶ 18} Here, it is undisputed that Deputy Marshal Youngless had arrest warrants in his possession when he detained Harris, and Harris had the backpack on his person at the time of his arrest. Thus, under the authority of *Adams*, Youngless had the right to conduct a search of the backpack.

{¶ 19} We next address Harris's claim that the pretrial identification made by Je'an was improper and should have been suppressed. Specifically, he complains that the identification was unduly suggestive because House only presented one picture of Harris to Je'an to confirm that Harris was the person Je'an knew as Blakk.

{¶ 20} "To justify suppressing a pretrial identification, a defendant must demonstrate (1) that the identification procedure used was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification, and (2) that the identification in fact was unreliable under the totality of the circumstances." (Citations omitted.) *State v. Green*, 2003-Ohio-5744, ¶ 5 (2d Dist.). "In other words, even if an identification procedure was overly suggestive, the identification remains admissible if sufficient evidence of reliability exists. A determination of reliability is unnecessary, however, where an identification procedure was not unduly suggestive." (Citation

omitted.) *Id.*

{¶ 21} Je'an's identification of Harris from a photograph did not involve a witness identifying a person who was unknown to them. Although Je'an knew him only as Blakk, Je'an was very familiar with Harris, whom he had known for years. Je'an gave House information about Blakk and showed House Harris's Facebook page. Je'an confirmed that a photograph which House subsequently located was the person he knew as Blakk. As such, we agree with the trial court's finding that this identification was reliable.

{¶ 22} Finally, Harris contends that a pretrial identification made by P.B. should have been suppressed. In support, he argues that the reliance by the police on the identification made by Je'an rendered P.B.'s identification improper.

{¶ 23} The record demonstrates that House prepared a photographic array. He began with a picture of Harris taken from a law enforcement website, then searched the website for pictures of men who were similar in appearance. After creating the photographic array of six photographs, House assigned another detective, Sara Lipps, to present the array to P.B. Lipps was not familiar with the case or the suspects, and she did not have the identification key for the array. She properly instructed P.B. on the identification process. P.B. identified Harris as the offender.

{¶ 24} As noted, Harris argues that the identification was improper because of the prior identification made by Je'an. He does not claim the photographic array was unduly suggestive or that it was improperly administered. We find nothing in the record to suggest that the identification made by P.B. was suggestive or unreliable. Therefore, we conclude the trial court did not err in denying suppression of this identification.

{¶ 25} The trial court did not err in overruling the motions to suppress. The first assignment of error is overruled.

### III.    Manifest Weight and Sufficiency

{¶ 26} The second assignment of error asserted by Harris states:

THE EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE TO SUSTAIN HARRIS' CONVICTIONS.

{¶ 27} Harris contends the evidence presented at trial was not sufficient to identify him as the shooter and that his convictions were against the manifest weight of the evidence.

{¶ 28} "[S]ufficiency is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Marshall*, 2010-Ohio-5160, ¶ 52 (2d Dist.), quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. The relevant inquiry is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the crime's essential elements proven beyond a reasonable doubt. *Id.*

{¶ 29} On the other hand, when an appellate court reviews whether a conviction is against the manifest weight of the evidence, "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). A case should not be reversed as being against the manifest weight of the evidence except " 'in the exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*

{¶ 30} "[A]lthough sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." (Citations omitted.) *State v. McCrary*, 2011-Ohio-3161, ¶ 11 (10th Dist.). *Accord State v. Winbush*, 2017-Ohio-696, ¶ 58 (2d Dist.). As a result, a determination that a conviction is supported by the weight of the evidence will also be dispositive of sufficiency. *State v. Farra*, 2022-Ohio-1421, ¶ 50 (2d Dist.).

{¶ 31} LaVon Robinson testified that a black male who had been on Oldham's porch doing something with his bike was the same person who committed the shooting. A hammer found on the porch was collected and was found to have Harris's DNA on it. Larry and Je'an Crutcher each testified that Harris had been in front of their home with a bike shortly before the shooting. Larry Crutcher identified Harris as the person who he observed fire a gun into the SUV. P.B. identified Harris from a photographic array. The

gun recovered from Harris's backpack was identified as the weapon used in the shooting, and phone records demonstrated that Harris was in the vicinity of the shooting at the time it occurred.

{¶ 32} Based upon this evidence, we see no basis for concluding that the jury lost its way in finding that Harris was the shooter. Accordingly, the second assignment of error is overruled.

## IV. Consecutive Sentences

{¶ 33} Harris's third assignment of error is as follows:

THE TRIAL COURT'S FINDINGS FOR THE IMPOSITION OF CONSECUTIVE PRISON TERMS ARE CONTRARY TO LAW AND NOT CLEARLY AND CONVINCINGLY SUPPORTED BY THE RECORD.

{¶ 34} Harris asserts the record fails to support the trial court's findings in support of consecutive sentences. We disagree.

{¶ 35} R.C. 2929.14(C)(4) permits a trial court to impose consecutive sentences if it finds that (1) consecutive service is necessary to protect the public from future crime or punish the offender; (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; and (3) one or more of the following findings are made:

(a) The offender committed the offenses while awaiting trial or sentencing, was under a sanction imposed pursuant to R.C. 2929.16, R.C. 2929.17, R.C. 2929.18, or was under post-release control;

(b) At least two of the offenses were committed as part of one or more courses of conduct, and the harm was so great that no single prison term adequately reflects the seriousness of the conduct;

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

R.C. 2929.14(C)(4)(a)-(c).

**{¶ 36}** "The plain language of R.C. 2953.08(G)(2) requires an appellate court to defer to a trial court's consecutive-sentence findings, and the trial court's findings must be upheld unless those findings are clearly and convincingly not supported by the record." *State v. Gwynne*, 2023-Ohio-3851, ¶ 5; *State v. Norris*, 2023-Ohio-4057, ¶ 13 (2d Dist.).

**{¶ 37}** The trial court found that consecutive sentences were necessary to protect the public from future crime or to punish Harris. The court further found that consecutive sentences were not disproportionate to the seriousness of Harris's conduct and the danger he posed to society. The court also found that the offenses were committed as part of one or more courses of conduct, and the harm was so great that no single prison term would adequately reflect the seriousness of the conduct. Finally, the court found that Harris's history of criminal conduct demonstrated that consecutive sentences were necessary to protect the public from future crime. Thus, the trial court made findings which supported the imposition of consecutive sentences, and the sentences must be upheld unless we find that those findings were clearly and convincingly not supported by the record.

{¶ 38} According to the record, Harris fired numerous shots at a vehicle with three passengers. One of those passengers was killed, and a second suffered a gunshot wound. Thus, the record supported a finding that two or more offenses were committed as part of one course of conduct, and that by killing one victim and injuring a second victim, the harm caused was so great that no single prison term would adequately reflect the seriousness of the conduct. Additionally, the presentence investigation report showed that Harris had been adjudicated as unruly as a teenager, had been placed on probation, and had violated the terms of that probation. He also had a lengthy misdemeanor offense history which included convictions for assault and domestic violence. Further, Harris was indicted in May 2021 for aggravated possession of drugs, possession of cocaine, obstructing official business, and resisting arrest. In June 2021, he was indicted for aggravated possession of drugs and receiving stolen property. He was awaiting trial on both of those cases when he committed the instant offenses. Additionally, Harris had been placed on intervention in lieu of conviction (ILC) in March 2021 for an aggravated possession of drugs charge. At some point he violated ILC and absconded. Thus, the record supported a finding that Harris had committed the offenses while awaiting trial or sentencing and that his history of criminal conduct demonstrated that consecutive sentences were necessary to protect the public from future crime by him.

{¶ 39} On this record, we cannot conclude that the trial court's consecutive sentence findings were clearly and convincingly not supported by the record. Accordingly, the third assignment of error is overruled.

## V.     Conclusion

**{¶ 40}** All of Harris's assignments of error being overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .


WELBAUM, J. and LEWIS, J., concur.