[Cite as *State v. Raymundo*, 2025-Ohio-3309.]

COURT OF APPEALS
TUSCARAWAS COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO, | Case No. 2024 AP 11 0036 |
| Plaintiff - Appellee | <u>Opinion And Judgment Entry</u> |
| -vs- | Appeal from the Tuscarawas County Court of Common Pleas, General Trial Division, Case No. 2023 CR 08 0247 |
| JACINTO HERRERA RAYMUNDO, | |
| Defendant – Appellant | Judgment:   Affirmed |
| | Date of Judgment Entry: September 12, 2025 |

**BEFORE:** Craig R. Baldwin; Robert G. Montgomery; David M. Gormley, Appellate Judges

**APPEARANCES:** KRISTINE W. BEARD, for Plaintiff-Appellee; DAN GUINN, for Defendant-Appellant.

OPINION

*Montgomery, J.*

**{¶1}**   Defendant-Appellant appeals from a jury verdict in Tuscarawas County Court of Common Pleas, General Trial Division, finding him guilty of two counts of rape and one count of gross sexual imposition.  For the reasons below, we AFFIRM.

**STATEMENT OF THE CASE**

**{¶2}**   Defendant-Appellant, Jacinto Herrera Raymundo ("Appellant"), was indicted by the Tuscarawas County Grand Jury for one count of Rape of a victim less than 13 years of age, in violation of R.C. 2907.02(A)(1)(b) and purposely compelling the victim

to submit by force or threat of force pursuant to R.C. 2971.03(B)(1)(c), a felony of the first degree with a sentencing enhancement [Count One], one count of Rape of a victim less than 13 years of age, in violation of RC. 2907.02(A)(1)(b) [Count Two], and one count of Gross Sexual Imposition of a child less than 13 years of age, in violation of R.C. 2907.05(A)(4), a third-degree felony [Count Three].

{¶3} Appellant pled not guilty, and the case proceeded to trial. During the trial, the State presented the testimony of multiple witnesses including: the minor victim, MC; the victim's minor friend, KN; the victim's mother - Rosario Cedillo Raymundo ("Rosario"); the victim's family members - Maria Cedillo Raymundo and Humberto Perez; Nichole John – a forensic interviewer from Noah's Hope Child Advocacy Center, Alissa Edgein, a Nurse Practitioner with Akron Children's Hospital, and two Dover Police Officers - Officer Haley Miller and Detective Jason Peters. Herrera also testified on his own behalf.

{¶4} After presentation of the evidence and closing arguments, the jury deliberated and ultimately returned a guilty verdict on all counts. At the time of sentencing, the State moved to merge counts one and two of the indictment and elected count one for sentencing purposes. Appellant was sentenced to a mandatory indefinite term of imprisonment of twenty-five (25) years to life for Count One, and a sixty (60) month prison term for Count Three.

## RELEVANT BACKGROUND FACTS

{¶5} Rosario and Appellant met when MC was about five years old. The two never officially married but began living together when MC was about seven and they have one minor child together. Rosario's family is extremely close-knit and spent a lot of time at each other's homes. The family fully accepted and welcomed Appellant as a

member. Initially, MC and Appellant had a good father-daughter relationship and MC's family described MC as a very happy child.

{¶6} Around age 12, Rosario and her sisters, Maria and Juana, began noticing a significant difference in MC's disposition and behavior. They testified that MC was mad and angry all the time. Rosario noticed that MC stopped calling Appellant "dad" and also noticed that MC and Appellant didn't sit on the sofa together like they had in the past. When Appellant tried to hug MC, she would push him away and tell him to leave her alone. Rosario's sisters shared their concerns about MC with Rosario. Rosario also started noticing Appellant do strange things with MC. For example, when Rosario, Appellant, and MC played basketball outside, Appellant would take the ball away from MC and in the process, touched over MC's breasts. Rosario sensed in her heart that something was wrong but waited for the right time to talk with MC.

{¶7} On the evening of July 21, 2023, MC and her family were getting ready for bed in Rosario and Appellant's bedroom, that they shared with their young son. Rosario sometimes had trouble sleeping so Appellant encouraged her to take Tylenol PM. Appellant then took MC's phone away from her and MC left the room upset and crying. Rosario asked Appellant why he took MC's phone from her; Appellant stated it was to make sure that MC wasn't doing anything inappropriate. This did not make sense to Rosario, and she questioned Appellant regarding how MC could do anything wrong when she was always with them.

{¶8} Shortly thereafter, Appellant got up from the bed and told Rosario he was going downstairs to clean the kitchen. Rosario tried to put her son to sleep. The time passed but Appellant did not return, and Rosario did not hear anything in the kitchen.

Rosario "had a feeling with something in my heart," so she wanted to say goodnight to MC, to make sure she was ok since she'd been upset earlier. *Trial Tr., Vol. III*, p. 285. Rosario left her room quietly and went to MC's room, opened the door and saw Appellant hugging MC, his arm was over her shoulder and was touching her. Rosario asked Appellant why he was in MC's room; he replied that he was telling MC goodnight and was going downstairs to clean the kitchen. Rosario testified that this made her believe it was the right time to talk with MC, so she closed and locked the door, and spoke with her.

{¶9} When Rosario asked MC if she was ok, MC put her head down and started shaking. Rosario asked MC if Appellant hurt her, and MC told her that Appellant had been touching her, stating "[h]e has touched my vagina and he has touched other parts." *Id.*, p. 287. Rosario stated she was in shock, and asked MC "what are you talking about." *Id.* MC replied, "yes mom, when you sleep he comes around two in the morning he comes to my room to touch me." *Id.* MC told Rosario she was afraid that Appellant would hurt them since MC told her of the abuse. Rosario called her sister, Maria, and Rosario, MC, and Rosario's son, walked to Maria's house to stay. After arriving, Rosario told Maria and her husband, Humberto, what MC shared with her. Humberto called the police.

{¶10} Officer Haley responded to the call, spoke with MC and later transferred the case to Detective Peters. Throughout the evening, Appellant repeatedly came to Maria's house, knocking on the door and demanding to come inside. Detective Peters eventually arranged for MC to have a forensic interview by Nichole John at Noah's Hope Child Advocacy Center. After the interview, MC spoke to Nurse Edgein at Akron's Children Hospital for purposes of diagnosis and treatment. After viewing the forensic interview

and speaking with MC directly, Nurse Edgein diagnosed MC with sexual abuse and the above charges were filed against Appellant.

## SOLE ASSIGNMENT OF ERROR

{¶11} "I. THE APPELLANT'S CONVICTION FOR RAPE AND GROSS SEXUAL IMPOSITION WAS NOT SUPPORTED BY EITHER THE LEGALLY SUFFICIENT EVIDENCE OR THE WEIGHT OF THE EVIDENCE PRESENTED AT TRIAL."

## STANDARD OF REVIEW

{¶12} The test for sufficiency of the evidence is "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102 (1997), fn. 4. *State v. Worley,* 2021-Ohio-2207, ¶57. A sufficiency-of-the-evidence challenge asks whether the evidence adduced at trial "is legally sufficient to support the jury verdict as a matter of law." *State v. Lang*, 2011-Ohio-4215, ¶ 219.

{¶13} Weight of the evidence addresses the evidence's effect of inducing belief. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997); *State v. Williams*, 2003-Ohio-4396, ¶83. When a court of appeals reverses a judgment of a trial court as against the weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the fact finder's resolution of conflicting testimony. *State v. Jordan*, 2023-Ohio-3800; *Thompkins* at 387; *Williams,* ¶ 60. The reviewing court must determine whether the jury clearly "lost its way and created such a manifest miscarriage of justice" that the conviction cannot stand, and a new trial must be ordered. *Id.*, quoting *State v. Group*, 2002-Ohio-7247, ¶ 77 (citations omitted).

**{¶14}** In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact. *Eastley v. Volkman,* 2012-Ohio-2179, ¶ 21; *In re Z.C.,* 2023-Ohio-4703, ¶ 14. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the [trier of fact] is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland,* 10 Ohio St.3d 77, 80 (1984).

**{¶15}** "Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." *State v. McCrary,* 2011-Ohio-3161, ¶ 11 (10th Dist.), citing *State v. Braxton*, 2005-Ohio-2198, ¶ 15 (10th Dist.) (noting that "a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency.") (Other citation omitted.); *State v. Winbush,* 2017-Ohio-696, ¶ 58 (2d Dist.). As a result, a determination that a judgment is supported by the weight of the evidence will also be dispositive of sufficiency. *State v. Farra,* 2022-Ohio-1421, ¶ 50 (2d Dist.).

**{¶16}** Here, Appellant was convicted of rape in violation of R.C. 2907.02(A)(1)(b) with enhancement which states the following:

(A)(1) No person shall engage in sexual conduct with another when any of the following applies:

(b)　The other person is less than thirteen years of age, whether or not the offender knows the age of the other person.

The enhancement was purposely compelling the victim to submit by force or threat of force pursuant to R.C. 2971.03(B)(1)(c).

{¶17} Appellant was also convicted of gross sexual imposition in violation of R.C. 2907.05(A)(4), which states the following:

(A)  No person shall have sexual contact with another; cause another to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:

(4)  The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person.

{¶18} Appellant argues that because there was no physical evidence indicating Appellant harmed the victim, such as DNA evidence or notable injuries, the verdict is not supported by the evidence and is against the weight of the evidence. Appellant further claims that, "[t]he primary issue with the Appellee's case is that the only evidence presented is based on the child's statements. For years, while these alleged incidents were supposedly happening, she did not disclose them to anyone despite having numerous opportunities."

{¶19} Appellant's arguments are wholly without merit. The evidence presented at trial supports Appellant's convictions. The jury did not clearly lose its way or create such a manifest miscarriage of justice such that Appellant's conviction must be overturned. Indeed, multiple witnesses testified in support of MC's version of events that could easily lead the jury to believe that Appellant committed the crimes as charged.

{¶20} Nichole John, a certified forensic examiner with Noah's Hope - who has conducted over 300 interviews with children - testified that MC provided specific details

about the sexual abuse. The jury watched MC's interview with Ms. John at trial and was able to listen to her questions as well as MC's responses. Ms. John testified that MC's version of the abuse included "idiosyncratic details," meaning she could accurately describe the difference in bodily sensation when Appellant engaged in digital penetration versus vaginal penetration. MC also told Ms. John that there was sometimes white sticky stuff in her underwear after an incident.

{¶21} MC herself testified at trial revealing the details and circumstances surrounding the abuse. MC stated that when she was around 11 years old, Appellant began to treat her differently and began touching her inappropriately. Appellant initially tried small actions, such as hugging her on the couch while watching a movie and brushing his hand across her breast. MC stated that over time, Appellant started to touch her underneath her clothes, and ultimately had sexual intercourse with MC, more than once. MC indicated that if she tried to stop Appellant, he grabbed her arms or used his body weight and continued. MC testified that her mom was either not home or was asleep when these incidents occurred. MC testified in detail regarding one such incident that occurred a few days before her thirteenth birthday around 2:00 or 3:00 in the morning. *Trial Tr., Vol. II*, p. 248-49. MC testified she did not tell her mom at first because Appellant warned her not to because her mom would be mad at her. MC did confide in her then close friend, KN, using the snap chat app. KN told her that she needed to tell her mom what was happening.

{¶22} Nurse Practitioner Allisa Edgein, with Akron Children's Hospital, also testified regarding MC's specific details to her. Nurse Edgein was qualified as an expert in pediatric sexual assault. Nurse Edgein testified that as part of the medical exam, she

reviewed the forensic interview and further discussed the allegations with MC. Nurse Edgein testified that MC told her that Appellant had touched her vagina and put his fingers and penis in her vagina. Nurse Edgein inquired about the use of a condom for STD purposes and told MC about condoms. MC stated that Appellant used a condom that he got from a drawer where he kept his clothes, and he would open the package and put the condom on top of his privates. MC told the nurse that she would experience pain, and described it as a sharp pain in her vagina and in her belly during and after the incidents. MC stated that her vaginal area also burned when she peed, possibly resulting from micro-abrasions according to Nurse Edgein. Nurse Edgein further explained that the body heals very quickly such that a lack of physical traumatic findings is inconsequential and in fact, she typically does not see any such evidence of trauma. The abuse occurred multiple times.

{¶23} Aside from the above witness testimony, MC's mom, Rosario, testified at length regarding her daughter, the relationship between Appellant and MC, and MC's revelation to her regarding the abuse. Rosario stated that at around age 11, MC began to act very strangely. Rosario's sisters - Maria and Juana - similarly noticed MC's behavior changes and shared their concerns with Rosario. Rosario first thought it was just MC getting older and having normal changes, but her heart was telling her it was more than that. Rosario also began observing Appellant touching MC in inappropriate ways and suspected something. Rosario testified:

A: Well it, it was a big change because she would be on the sofa, Jacinto would come home and he would go straight to the sofa to hug her and she would push [him] aways and say leave me alone, don't touch me. And

Jacinto would come to me and say I don't know what is wrong with your daughter, she's pushing me away. And I said, you know, if she doesn't want to be hugged, just stay away from her.

Q: Were there other things that you found odd in the physical relationship between Jacinto and [MC]?

A: Well when we, when I went out to play basketball with my daughter and him, he intentionally would take the ball away from [MC] * * * But it was weird the way he would take the ball away from [her] because he will find a way to hug her and touch her breast. And I watch him many times. And I said this is odd, but I, instead I would turn around and pretend that I didn't see it, but I knew something was wrong but I wanted to find the right time to ask [her] what was going on.

*Trial Tr., Vol. III*, p. 281.

**{¶24}** Eventually, as set forth above, Rosario took the opportunity to discuss things with MC. Once MC disclosed the abuse to her, Rosario immediately took MC and her son out of the home and sought help from her family, the police, and other professionals.

**{¶25}** After the State's presentation of witnesses, Appellant testified in his own defense. Appellant's counsel asked if he ever abused MC and Appellant replied, "no, no way." Although Appellant did not call additional witnesses, Appellant's counsel thoroughly cross-examined each of the State's witnesses and zealously argued on behalf of Appellant at trial. In the final analysis, the jury heard all the witness testimony and examined the evidence and chose to believe the prosecution's version of events. As set

forth above, the credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts to resolve. *State v. DeHass*, 10 Ohio St.2d 230 (1967). The jury is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use their observations to weigh the credibility of each witness. *Seasons Coal*, supra at 80. There is ample evidence to support Appellant's convictions on all counts. Accordingly, the jury verdict is supported by legally sufficient evidence and is not against the manifest weight of the evidence. Appellant's sole assignment of error is overruled.

## CONCLUSION

{¶26} Because the jury verdict is supported by the evidence, Appellant's sole assignment of error is overruled. The judgment of the Tuscarawas County Court of Common Pleas, General Trial Division, finding Appellant guilty on all counts is affirmed.

{¶27} Costs to Appellant.

By: Montgomery, J.

Baldwin, P.J. and

Gormley, J. concur.